50 F.3d 908
 RICO Bus.Disp.Guide 8790
 HIBISCUS ASSOCIATES LTD., a Florida partnership; Gerald M.
Wochna; Joyce Wochna; Thomas A. Head; Rita B. Head; The
Hibiscus Development, Inc., Plaintiffs-Counterclaim
Defendants-Appellees, Cross-Appellants,
v.
BOARD OF TRUSTEES OF the POLICEMEN AND FIREMEN RETIREMENT
SYSTEM OF the CITY OF DETROIT,
Defendant-Counterclaim
Plaintiff-Appellant, Cross-Appellees.
HIBISCUS ASSOCIATES LTD., a Florida partnership; Gerald M.
Wochna; Joyce Wochna; Thomas A. Head; Rita B.
Head; The Hibiscus Development, Inc.,
Plaintiffs-Counterclaim
Defendants-Appellees,
v.
BOARD OF TRUSTEES OF the POLICEMEN AND FIREMEN RETIREMENT
SYSTEM OF the CITY OF DETROIT,
Defendant-Counterclaim Plaintiff-Appellant.
 Nos. 92-2387, 92-3047.
 United States Court of Appeals,
Eleventh Circuit.
 April 20, 1995.
 
 Alan K. Cotler, Pepper, Hamilton & Scheetz, Philadelphia, PA, for appellants.
 Robert J. Valerian, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, for appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before ANDERSON and DUBINA, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 This litigation concerns a $10.6 million loan that the Board of Trustees of the Policemen and Firemen Retirement System of the City of Detroit (hereinafter the "Pension Fund") made to Hibiscus Associates, Ltd. (hereinafter "HAL") on December 9, 1985, for development of the Oaks Shopping Center in Melbourne, Florida. A dispute arose between the parties in this case over whether HAL and the Guarantors of the loan (Hibiscus Development, Inc. (hereinafter "HDI")), Thomas and Rita Head, and Gerald and Joyce Wochna)[1] had satisfied their obligations under the loan. HAL and the Guarantors are the plaintiffs in this action, and brought suit seeking a declaratory judgment and specific performance of a mortgage loan and guaranty modification agreement (the "Modification"), that was negotiated in 1988. The Pension Fund counterclaimed alleging federal and state RICO violations, breach of contract, and fraudulent inducement regarding the Modification. This case has gone to trial twice with two juries returning verdicts in favor of the Pension Fund. Despite these verdicts, the district court below entered various orders in both trials limiting the recovery of the Pension Fund. The Pension Fund appeals these adverse rulings. We find that the district court erred in granting a second trial, thus we reinstate the jury's verdict in the first trial and remand for further proceedings.
 
 I. FACTS AND PROCEEDINGS BELOW
 
 2
 In October 1984, Gerald Wochna and Thomas Head entered into an agreement to purchase a 17-acre parcel of property on Hibiscus Road in Melbourne, Florida. They decided to build a shopping center at the location, and formed HAL to further their business interests in the property. In June of 1985, the Mortgage Investors Group, Inc. ("MIG") contacted HAL regarding a potential investment in the property. MIG is the Pension Fund's investment advisor and manager. On July 30, 1985, HAL applied through MIG for a construction loan from the Pension Fund to build a shopping center on the Melbourne property.
 
 
 3
 On December 9, 1985, the Pension Fund loaned HAL $10.6 million to develop the Oaks Shopping Center on the Melbourne property. As part of the loan, the parties executed a Construction and Permanent Loan Agreement (the "Loan Agreement"), a Mortgage Note (the "Note"), a Construction and Permanent Mortgage and Security Agreement (the "Mortgage"), and an Assignment of Leases and Rents. HDI, the Heads, and the Wochnas executed personal guarantees of HAL's performance of its loan obligations and repayment of the debt.
 
 
 4
 The Loan Agreement split the transaction into two loans: the construction loan and the permanent loan. Under the construction loan, HAL was only required to make interest payments on the balance of the loan; however, the amount of the Guarantors' liability during the construction loan period was $10.6 million (the full amount of the loan). Upon commencement of the permanent loan, HAL was required to make payments on both the principal and interest of the loan, but the Guarantors' liability was to be reduced to $2.12 million. Under the Agreement, the construction loan period was to last two years. However, the Loan Agreement contained the following condition on commencement of the permanent loan:Conversion from Construction Loan to Permanent Loan. Upon the expiration of the Construction Loan Period (whether on the Completion Date or, at Borrower's election, on the second anniversary of the Closing Date) and provided (i) no Event of Default has occurred and no event is occurring which, with the passage of time or the giving of notice, or both, would constitute an Event of Default under any Loan Document; (ii) Lender has received the Final Survey; (iii) all conditions regarding the Construction Loan have been satisfied; and (iv) Borrower has obtained the required Architect's Certificate of Completion and a permanent and unconditional certificate of occupancy and other required permits from applicable Governmental Authorities, the Loan shall convert to a Permanent Loan, pursuant to which interest shall accrue at the applicable Basic Interest Rate and monthly payments of principal and interest shall be payable in an amount sufficient to amortize the outstanding principal balance over a term of thirty (30) years, with final payment of principal, accrued interest and all other sums due under the Loan on the Maturity Date.
 
 
 5
 Loan proceeds were to cover the cost of the land and construction as described in a detailed construction budget provided in the Loan Agreement. Upon completion of construction, the "cost savings" provision of the Loan Agreement allowed HAL to draw as profit from the loan proceeds any savings between the budgeted construction costs and the actual costs of the shopping center. Proceeds were disbursed to HAL as costs were incurred via HAL's submission of monthly requests for loan advances ("draw requests"). In each draw request, HAL itemized the costs it incurred for which loan funds were being requested. Head signed the draw requests, and in doing so certified that the requested funds would pay the list of costs, that project costs remained as originally projected, and that the remainder of the loan was "sufficient to fully complete and pay for construction of the entire building." HAL submitted monthly draw requests to MIG, and upon receipt of the draw requests (usually by U.S. mail), the Pension Fund would advance the funds requested, usually by wire transfer.
 
 
 6
 One of the items in the construction budget was Retail Tenant Improvements. During construction, each retail space would be left an empty shell until a tenant had signed a lease for that space. After a tenant had been signed, the Tenant Improvement dollars were used to "finish" the retail space for the tenant. For example, Tenant Improvement funds were spent to apply floor finish to the concrete floor slab, paint and cover walls, install electricity and phones, install sprinklers, and other finish-work. The loan budgeted $375,768 for Tenant Improvements to the 51,575 square feet of retail space in the shopping center, or slightly more than $7.25 per square foot.[2] Head and Wochna treated this budget item as an allowance, drawing only $7.25 per square foot from the loan for completed tenant improvements and charging HAL or the tenant for the difference if the improvement cost was greater. Tenants routinely requested improvements costing more than $7.25 per square foot. In fact, the actual cost of Tenant Improvements averaged between $12 to $13 per square foot. In each case, Head and Wochna drew only the $7.25 per square foot "allowance" from the loan, and the balance was paid by HAL and/or the tenant.
 
 
 7
 In October, 1986, Head and Wochna reported that construction was substantially complete and that the requisite certifications had been obtained. Tenant improvements on the leased retail space had been funded and completed. Head and Wochna informed the Pension Fund that a reserve of $398,000 was sufficient to complete the 42,000 square feet of unleased retail space and requested that the remaining hard cost allocation be paid to them pursuant to the "cost savings" provision of the Loan Agreement. This $398,000 reserve included $344,000 for Retail Tenant Improvements on the remaining unleased space, or slightly more than $7.25 per square foot. The Pension Fund wired the funds requested to HAL, and distributed $250,000 in cost savings to HDI, Head and Wochna.
 
 
 8
 HAL's efforts to lease the rest of the space in the center during the remainder of 1986 and 1987 met with only limited success. Additionally, HAL began to experience problems collecting rent from some of the current tenants. By February, 1988, the Oaks was operating at a monthly deficit of $30,000, and the interest reserve had almost run out. Clearly, the Oaks was in trouble financially, and all were concerned that HAL might not be able to keep up with the loan payments once the interest reserve ran out. On February 22, 1988, Head wrote to MIG on behalf of HAL and the Guarantors requesting a modification of the Loan Agreement and Guaranties to give them "monetary and emotional relief."
 
 
 9
 The parties entered into negotiations to modify the loan agreement and the Modification became effective in April of 1988. Under the Modification, HAL and the Guarantors agreed to contribute $300,000 in "new cash" to the property. This "new cash" was to be spent on the Oaks according to a budget attached to the Modification. In consideration for these promises, instead of paying a flat 10% interest per year on the loan, HAL was permitted to pay interest equal to the net cash flow from the center with a floor of 7.25% per year and a ceiling of 10% per year. The Modification also reduced the Guarantors' personal liability on the project to $1 million.
 
 
 10
 The Modification also provided conditions under which the Guarantors would be completely absolved of personal liability for the project. However, the parties hotly contest the meaning of these conditions in the Modification. According to the plaintiffs, the Modification provided that, upon a $600,000 equity infusion into the Oaks by HAL and the Guarantors, HAL's immediate transfer of the property to the Pension Fund would release the Guarantors from personal liability. According to the Pension Fund, the Modification provided that HAL could not release the Guarantors by tendering the property before the end of a two-year workout period.
 
 
 11
 By October, 1988, only six months after the modification had become effective (and eighteen months before the end of the two-year workout period), plaintiffs asserted that they had nearly met the $600,000 threshold for infusion of new cash, and that the threshold would go over if required to make the October interest payment. The Guarantors wanted to turn over the Oaks and be released from personal liability under what they asserted were the terms of the Modification. On October 28, 1988, HAL and the Guarantors informed the Pension fund that they were placing the deed to the Oaks property in escrow and tendering a check which they asserted would raise their expenditures past the $600,000 new cash threshold. HAL did not make the October interest payment, nor did HAL attempt to make any further interest payments under the Loan Agreement or Modification.
 
 
 12
 A meeting was held in the offices of MIG between representatives of the parties on December 15, 1988. At that time, the Pension Fund informed Wochna and Head that the Fund considered the Modification to be null and void due to a purported failure of a condition precedent to the Modification's effectiveness. The Pension Fund accelerated the loan and demanded payment of the entire principal and accrued interest under the original Loan Agreement. That same day HAL and the Guarantors filed this action for declaratory judgment.
 
 
 13
 The plaintiffs (HAL, HDI, the Heads, and the Wochnas) brought suit in Brevard County, Florida Circuit Court seeking declaratory relief and specific performance of the Modification. The Pension Fund removed the case to the U.S. District Court for the Middle District of Florida based on both diversity and federal question jurisdiction. The Pension Fund's answer to the plaintiffs' complaint denied plaintiffs' compliance with, and the validity of, the Modification, and included counterclaims under federal and Florida RICO statutes, breach of contract, and for fraudulently inducing the Fund to execute the Modification.
 
 
 14
 The case went to trial on March 7, 1991. At trial, one of the Pension Fund's theories was that HAL and the Guarantors had not satisfied the conditions for conversion of the construction loan to the permanent loan. The Fund urged that the project had not been substantially completed, and that HAL and the Guarantors had never obtained the unconditional certificate of occupancy. The Pension Fund intended to introduce evidence that the unconditional certificate of occupancy had not been obtained through the testimony of John Dowling. The Fund proffered Dowling as an expert in the financing, development, operation and management of real estate projects similar to the Oaks. The district court disallowed the testimony. After the parties had rested, the Fund again requested that the district court admit the testimony of John Dowling regarding the unconditional certificate of occupancy. The district court again refused, and found that the Fund had "waived" the argument that the loan had not converted from a construction to a permanent loan.
 
 
 15
 At the conclusion of all evidence, the district court directed a verdict against the Pension Fund on its RICO claims and sent the remaining issues to the jury. After one and one-half days of deliberation, the jury returned a verdict answering special interrogatories. It rejected all of the plaintiffs' claims and found that the Modification had been rescinded by reason of plaintiffs' material breaches. The jury awarded the Pension Fund $11.3 million against HAL and HDI, and $2.12 million against the individual Guarantors.[3] The jury also ruled against the Pension Fund's claim that the Modification had been fraudulently induced.
 
 
 16
 The plaintiffs filed post-trial motions for judgment notwithstanding verdict (JNOV) or, alternately, for new trial. The district court found that it had given an erroneous jury instruction on rescission; that Florida law did not provide rescission as a remedy for material breach of a partially performed contract, as the court had instructed, absent fraud or other "independent ground." Finding that no independent ground justifying rescission existed, the district court granted the plaintiffs' motion for JNOV on the rescission claim. The district court also granted a new trial based on the erroneous rescission instruction and juror confusion, limited to the issue of breach of the Modification Agreement. However, the court left intact the jury's finding in favor of the plaintiffs regarding the Pension Fund's fraudulent inducement claim.
 
 
 17
 The case was again tried before a jury on December 3, 1991. The second jury returned a similar verdict in favor of the Pension Fund, awarding the Pension Fund $10.3 million against HAL and HDI. The second jury also returned a verdict of $1 million against the Guarantors; in light of the prior JNOV ruling that the Modification was not rescinded, this was the maximum award possible against the Guarantors.
 
 
 18
 Based on plaintiffs' post-trial motions, the district court granted a remittitur that reduced the Guarantors' liability to the Pension Fund to $481,000. This reduction was based upon the Pension Fund's concession at trial that plaintiffs had invested $519,000 in the Oaks under the Modification Agreement and that, under the Agreement, such investment decreased the Guarantors' liability to the Fund dollar for dollar. Thus, judgment was entered against HAL and HDI and in favor of the Pension Fund in the amount of $10.3 million; and judgment was entered against the Guarantors and in favor of the Fund in the amount of $481,000.
 
 
 19
 Both sides also filed motions for attorney's fees, the Pension Fund asserting its entitlement under the specific language of the loan documents, while the plaintiffs asserted their entitlement to attorney's fees as prevailing Florida RICO defendants under Fla.Stat. Sec. 895.05(7). On June 9, 1992, a magistrate judge's Report and Recommendation was issued recommending that both sides' motions for attorney's fees be granted. With respect to the plaintiffs' attorney's fees, the magistrate judge concluded that the plaintiffs were prevailing parties because the Pension Fund had suffered a directed verdict against its Florida RICO claim. The magistrate judge referred the calculation of the fee awards to arbitration. The district court adopted the magistrate judge's Recommendation.
 
 
 20
 The Pension Fund raises four claims which merit discussion on appeal. First, the Fund argues the district court erred in granting JNOV in favor of the plaintiffs on the rescission claim, and in granting a limited new trial. Second, the Fund urges that the district court erred in ruling as a matter of law that the Fund had waived the requirements for conversion from a construction loan to a permanent loan. Third, the Fund argues that the court erred in directing a verdict against it on its federal and Florida RICO claims. And fourth, the Pension Fund appeals the district court's award of attorney's fees to plaintiffs under the Florida RICO statute.[4]
 
 
 21
 II. RESCISSION ISSUE: THE DISTRICT COURT'S GRANT OF LIMITED
 
 NEW TRIAL AND JNOV
 
 22
 After the first trial in this case, the jury returned a verdict in favor of the Fund, including a finding that HAL and the Guarantors breached a substantial provision of the Modification Agreement such that the Fund could rescind the Modification.[5] Post-trial, HAL and the Guarantors filed a motion for JNOV on the Fund's claim for rescission of the Modification Agreement.
 
 
 23
 In its motion for JNOV, HAL and the Guarantors argued that the district court had issued an erroneous instruction regarding the rescission claim.[6] HAL and the Guarantors argued that Florida law holds that cancellation or rescission will not be granted for a breach of contract absent some other equitable ground for rescission. In making this argument, HAL and the Guarantors relied heavily on International Realty Associates v. McAdoo, 99 So. 117 (Fla.1924), and Richard Bertram & Co. v. Barrett, 155 So.2d 409, 411 (Fla. 1st Dist.Ct.App.1963). Because the Fund relied only on a substantial breach of the contract as its basis for claiming rescission, HAL and the Guarantors argued that the jury instruction regarding rescission was erroneous and that it was entitled to judgment based on the International Realty standard.
 
 
 24
 The district court agreed with HAL and the Guarantors, first finding that its charge to the jury regarding rescission was in error. The district court quoted Richard Bertram, which stated "The rule is well settled in this country that cancellation or rescission will not be granted for breach of contract, in the absence of fraud, mistake, undue influence, multiplicity of suits, cloud on title, trust, or some other independent ground for equitable interference." 155 So.2d at 411-12. The district court went on to find that the Fund had presented no evidence in the case demonstrating the existence of an independent ground justifying rescission, and that HAL and the Guarantors had not abandoned or repudiated the Modification Agreement. Thus, the district court granted a JNOV in favor of HAL and the Guarantors on the rescission claim.
 
 
 25
 Although International Realty and Richard Bertram do state that as a general rule rescission will not be granted solely on grounds of breach, the Florida law recognizes an exception to this general rule for the breach of a dependent covenant in a contract. Steakhouse, Inc. v. Barnett, 65 So.2d 736 (Fla.1953). The Steakhouse court stated, "As a general rule, rescission is granted for fraud as to existing fact, but not for failure to perform a covenant or promise to do an act in the future, unless the covenant breached is a dependent one." Id. at 737. The Steakhouse court went on to say:
 
 
 26
 A covenant is dependent where it goes to the whole consideration of the contract; where it is such an essential part of the bargain that the failure of it must be considered as destroying the entire contract; or where it is such an indispensable part of what both parties intended that the contract would not have been made with the covenant omitted.... A breach of such a covenant amounts to a breach of the entire contract; it gives to the injured party the right to sue at law for damages, or courts of equity may grant rescission in such instances if the remedy at law will not be full and adequate.
 
 
 27
 Id. at 738 (citations omitted). See also, Gittlin Cos. v. David & Dash, Inc., 390 So.2d 86 (Fla. 3d Dist.Ct.App.1980); Hustad v. Edwin K. Williams & Co.--East, 321 So.2d 601, 603 (Fla. 4th Dist.Ct.App.1975) ("The breach of a dependent covenant gives the injured party the right to rescind the contract, or to treat it as broken and recover damages for a total breach."), cert. denied, 333 So.2d 41 (Fla.1976); Street v. Sugerman, 307 So.2d 883, 884 (Fla. 3d Dist.Ct.App.1974), cert. denied, 315 So.2d 196 (Fla.1975).
 
 
 28
 Thus, it is clear that Florida law recognizes that rescission may be granted where a party breaches a term which is an essential part of the bargain between the contracting parties such that its breach destroys the entire contract. The instruction to the jury was practically a verbatim statement of Florida law as set out in Steakhouse and its progeny. Therefore, we find that the jury instruction was not erroneous, and that Florida law does recognize rescission for a substantial breach of the contract that essentially destroys the contract. Accordingly, we hold that the district court erred in its conclusion that the jury instruction is deficient. Moreover, there is no indication that the jury was confused by the issues at trial exclusive of the rescission instruction. In light of our holding that the instruction was not erroneous, we reverse the district court's grant of a new trial.
 
 
 29
 The district court also granted JNOV in favor of the plaintiffs, holding as a matter of law that there was no rescission.[7] The standard of review for JNOV requires an independent determination of whether the facts and inferences point so overwhelmingly in favor of the movant, here HAL and the Guarantors, that reasonable people could not arrive at a contrary verdict. We find in this case that there was substantial evidence supporting the jury's findings that HAL and the Guarantors breached the heart of the Modification. The Fund adduced evidence that HAL was required to make interest payments for a minimum of two-years before it could tender the deed to the Oaks to the Pension Fund in satisfaction of its duties and obligations under the Modification. HAL and the Guarantors tendered the property to the Fund after only making five months of interest payments. Additionally, the Fund adduced evidence that neither HAL nor the Guarantors paid the $600,000 of "new cash" into the Oaks required under the Modification. Finally, the Fund presented evidence to show that plaintiffs further breached the Modification by abandoning management responsibilities for the Oaks without having been relieved of those duties in accordance with the Modification. The jury obviously credited the Fund's evidence that HAL and the Guarantors had abandoned their obligations under the Modification. We conclude that a reasonable jury could find that plaintiffs breached the Modification, and that this breach went to the heart of the contract.
 
 
 30
 The district court also stated, as a reason for granting the JNOV, that "it would be impossible to restore the parties to their original position." Equity will not usually order rescission unless the condition of the parties may be restored as it existed prior to the execution of the contract. See Steakhouse v. Barnett, 65 So.2d at 738. However, all that would be required to return the parties to the status quo was the return of any money spent under the Modification before the breach. See Janeczek v. Embry, 330 So.2d 837, 838 (Fla. 3d Dist.Ct.App.1976) ("Generally a court of equity will enter a monetary judgment when necessary to afford complete relief.").
 
 
 31
 Therefore, we reverse the judgment granting JNOV in favor of the plaintiffs on the rescission issue. Moreover, in light of our reversal of the district court's grant of a new trial, we order that the district court reinstate the jury's verdict in the first trial, including the jury's verdict in favor of the Fund on rescission. Thus, we reinstate the jury's verdict in favor of the Fund and against HAL and HDI in the amount of $11.3 million, and in favor of the Fund and against Head and Wochna in the amount of $2.12 million. We also instruct the trial court to return the parties to status quo by ordering the Pension Fund to return to the plaintiffs any money spent under the Modification.[8]
 
 III. DIRECTED VERDICT ON LOAN CONVERSION
 
 32
 The Pension Fund argues that the district court erred in refusing to allow Dowling to testify, and in ruling sua sponte that the Fund had "waived" its right to argue that the loan had not converted from a construction to a permanent loan.
 
 A. Exclusion of Dowling's Testimony
 
 33
 A judge has broad discretion to exclude expert testimony, and his action will be upheld unless it is manifestly erroneous. United States v. Sans, 731 F.2d 1521, 1530 (1984), cert. denied, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves. Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); Evans v. Mathis Funeral Home, Inc., 996 F.2d 266 (11th Cir.1993). The Fund offered Dowling as an expert in financing, development, operation and management of real estate projects. During trial the Fund proffered that Dowling would express his opinion that a "final unconditional certificate of occupancy" was not received and, therefore, under the terms of the loan, it had not converted from a construction to a permanent loan. Witnesses for both the Fund and the Guarantors had already testified to the existence of various certificates of completion and occupancy. There was no explanation at the proffer during trial that Dowling's testimony would be that an "unconditional certificate of occupancy" was different from those certificates already offered into evidence. Thus, the district court reasonably concluded that Dowling's testimony would be cumulative, and unnecessary to elucidate the simple factual issue of whether the unconditional certificate of occupancy was obtained. Therefore, the court did not err in excluding Dowling's testimony during trial.
 
 
 34
 After the parties had rested, the Fund again requested that the court admit Dowling's testimony. A judge has broad discretion to reopen a case to accept additional evidence, and his decision will not be overturned absent an abuse of that discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331, 91 S.Ct. 795, 802-03, 28 L.Ed.2d 77 (1971). It wasn't until this second request, after the close of evidence, that the Fund explained that Dowling was to testify that an "unconditional certificate of completion" was distinct from those certificates which witnesses testified had already been acquired. Even at this late stage, this additional information did not explain why the existence of an "unconditional certificate of occupancy" was more than a simple factual matter. The Fund did not need expert testimony to prove that an "unconditional certificate of occupancy" had not been obtained. Instead, if the Fund had desired to prove that such a certificate was not received, it could have evoked testimony from one of the participants in the loan transaction. Therefore, it was not an abuse of discretion to refuse to reopen the evidence to receive expert testimony on the matter.
 
 B. Directed Verdict on Conversion[9]
 
 35
 To prove damages against the Guarantors for breach of contract the Pension Fund had the burden of proving the amount of the Guarantors' obligation under the Loan Agreement. The Guarantors' liability limit during the construction loan was $10.6 million, but only $2.12 million after conversion to the permanent loan. Therefore, in order to claim $10.6 million, rather than $2.12 million, the Pension Fund had to show that the loan did not convert from a construction to a permanent loan. The Pension Fund argued that the loan had not converted because construction was not "substantially complete," and because a required "unconditional certificate of occupancy" had not been obtained.
 
 
 36
 There was overwhelming evidence presented at trial that the construction was "substantially complete." The Loan Agreement defines the "construction completion date" or "completion date" of the project in terms of the completion of the building shell. Tom Head and William Clark, an architect contracted by MIG to do site inspections of the Oaks, testified that the building shell was completed by October of 1986. Certificates of completion had been obtained from the city of Melbourne for the entire complex, indicating that the shell was completed, inspected and signed off by the city. Moreover, both Clark and the plaintiffs' architect had certified that the shell was completed in compliance with the Loan Agreement.
 
 
 37
 The Fund argues that the shell was not complete because part of the slab[10] had not been poured and some of the store fronts had not been installed. As Clark and others testified, it is standard practice to leave a slab unpoured where, as here, the space was intended for a restaurant that might require extensive underground plumbing, electric wiring and air conditioning. Similarly, the store fronts were left unfinished in order to accommodate the requirements of future tenants. Clark testified that the slab and the store fronts were not part of the shell, but part of the tenant improvement package and, therefore, the fact that these items were not completed did not affect his conclusion that the center was substantially complete in October of 1986. We conclude as a matter of law that the shell was substantially complete. The Fund adduced no evidence from which a reasonable jury could conclude otherwise.[11]
 
 
 38
 The Fund further argues that the loan did not convert because the plaintiffs did not obtain an "unconditional certificate of occupancy," a condition precedent for conversion from a construction loan to a permanent loan. The Fund maintains that an "unconditional certificate of occupancy" indicates more than completion of the building shell, but also that all of the tenant improvements are completed and all tenant spaces are ready for occupancy. The plaintiffs, on the other hand, argue that the loan was to convert on substantial completion of the shell, not upon completion of all tenant improvements, and that the certificates of completion already obtained from the city of Melbourne are equivalent to the required "unconditional certificate of occupancy."
 
 
 39
 The paragraph of the Loan Agreement detailing the conversion requirements refers only to an "unconditional certificate of occupancy," and no document with this title has been procured by the plaintiffs. However, other sections of the Loan Agreement refer to the same certificate as an "unconditional certificate of occupancy for the building shell " (emphasis added). See McGhee Interests v. Alexander Nat'l Bank, 102 Fla. 140, 135 So. 545 (1931) (a written contract must be construed as a whole). Moreover, by its terms, the Loan was to convert on the "completion date" provided that all of the conditions of conversion were met, and "completion date" refers to the completion of the building shell. Although the language of the Loan Agreement as a whole is probably best read to mean that the "unconditional certificate of occupancy" certifies completion of the building shell, there may be some ambiguity in that regard.
 
 
 40
 The cardinal rule of contract law is that a court should strive to effectuate the intent of the parties. Hughes v. Professional Ins. Corp., 140 So.2d 340, 345 (Fla. 1st Dist.Ct.App.), cert. denied, 146 So.2d 377 (1962). When a contract term is clear and unambiguous, the best evidence of this intent is the term itself, and a court may not give such term meaning beyond that clearly expressed in the four corners of the document. Fecteau v. Southeast Bank, N.A., 585 So.2d 1005, 1007 (Fla. 4th Dist.Ct.App.1991). However, when a contract term is ambiguous, the best evidence of the parties' intent is the construction the parties themselves put on the agreement through their conduct. Orlando Orange Groves Co. v. Hale, 119 Fla. 159, 161 So. 284, 295 (1935); Mayflower Corp., Crawford & Co. v. Davis, No. 93-3953, 1994 WL 716784, at * 3, --- So.2d ----, ---- (Fla. 1st Dist.Ct.App. Dec. 29, 1994). While the district court apparently talked about the conduct of the parties in terms of waiver, we believe that the substance of the court's decision was that the contract was ambiguous, that the conduct of the parties was relevant to determine their intent, and that such conduct clearly indicated that the conversion to permanent loan status did occur.
 
 
 41
 Generally, the proper construction of an ambiguous contract term is a question of fact which should be reserved to the jury. Fecteau, 585 So.2d at 1007. However, based on the evidence of the parties' conduct adduced at trial, the district court appropriately concluded that no reasonable juror could conclude that the Fund's construction of "unconditional certificate of occupancy" was correct, and that the loan had not converted. Two of the Pension Fund's own witnesses admitted that the loan had converted. First, Edwin Wayman, Chairman of the Board of MIG, testified, on both direct and cross examination, that the loan had converted from a construction to a permanent loan. Second, in a March 25 1988 letter, James Ogorek, Vice President and Chief Financial Officer of MIG, wrote to the Pension Fund that under the Modification the Guarantor's liability "will be reduced from $2,120,000 to $1,000,000." This letter, which was admitted into evidence, is effectively an admission that the loan had converted, and that the Guarantor's liability at the time of the Modification was under the Permanent Loan rather than the Construction Loan.
 
 
 42
 Ordinarily the right to determine the credibility of witnesses belongs to the jury and, therefore, it is inappropriate to take an issue from the jury when resolution of that issue requires the court to weigh the credibility of witnesses. Kridler v. Bituminous Cas. Corp., 409 F.2d 88, 91 (5th Cir.1969).[12] However, Wayman and Ogorek's credibility on the issue of whether the loan had converted was not questioned. Moreover, the Pension Fund did not introduce evidence from which a juror might infer that Wayman and Ogorek, two interested defense witnesses, were lying or mistaken on this point. In fact, the Fund relied on the testimony of both of these witnesses to establish the terms of the Loan Agreement and Modification. Under all of the evidence, especially the unimpeached testimony of these two witnesses directly in opposition to their interests, no reasonable juror could conclude that the loan had not converted. Therefore, the district court did not err in interpreting the ambiguous conversion provision of the loan agreement consistent with the behavior of the parties, and thus holding as a matter of law that the loan had converted to a permanent loan.
 
 IV. FEDERAL AND STATE RICO CLAIMS
 A. Directed Verdict
 
 43
 After the parties had rested, the district court granted a directed verdict against the Fund on its federal and Florida Rico[13] claims. The Fund asserts that this was in error because the district court necessarily weighed the credibility of the evidence, usurping the jury's function.
 
 
 44
 We review the district court's grant of a directed verdict de novo, applying the same standard applied in the district court in determining whether to grant a directed verdict. Sherrin v. Northwestern Nat'l Life Ins. Co., 2 F.3d 373, 377 (11th Cir.1993). In determining whether to direct a verdict against a party, the district court must consider evidence in light most favorable to that party. Dancey Co., Inc. v. Borg-Warner Corp., 799 F.2d 717, 719 (11th Cir.1986). Such verdict is properly granted if the facts and inferences so overwhelmingly favor the verdict that no reasonable juror could arrive at a contrary verdict. Huff v. Standard Life Ins. Co., 683 F.2d 1363, 1366 (11th Cir.1982).
 
 
 45
 The Fund asserts that the Guarantors fraudulently certified that there were sufficient funds remaining in the loan to complete the project with each draw request. Specifically, the Fund alleges that the Guarantors concealed the real cost of tenant improvements, leaving only $7.25 per square foot in the loan for completion of tenant improvements when an average of $12 to $13 per square foot was actually required.
 
 
 46
 To prove a RICO claim, a plaintiff must show that defendants: (1) caused an injury to the plaintiff's business or property as the result of (2) the conduct of (3) an enterprise (4) through a pattern of (5) racketeering activity. Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc., 906 F.2d 1546, 1553 n. 10 (11th Cir.1990), cert. denied sub. nom. Barnett Banks, Inc. v. Konstand, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991). "Racketeering activity" is defined in 18 U.S.C. Sec. 1961(1) as the violation of certain state and federal criminal statutes including, as alleged here, the federal mail fraud statute, 18 U.S.C. Sec. 1341. Mail fraud occurs when a person "(1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir.), cert. denied, 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).
 
 
 47
 Viewed in the light most favorable to the Pension Fund, the Fund has failed to adduce sufficient evidence for a jury to conclude that plaintiffs committed mail fraud and, therefore, has failed to prove "racketeering activity" which would support a RICO claim. It is undisputed that the Guarantors certified on each draw request that there was enough money remaining in the loan to complete construction, and that the approximately $7.25 per square foot left in the loan for Retail Tenant Improvements was insufficient to cover the cost of those improvements. However, the Fund has failed to adduce sufficient evidence from which a reasonable juror could find that this was an intentional scheme to defraud.
 
 
 48
 The Guarantors maintained, through Tom Head's testimony, that their certification of completion costs was not fraudulent. Head's testimony was that all of the parties knew that the loan provided only a $7.25 per square foot allowance for Retail Tenant Improvements, and that any additional cost of tenant improvements would be paid by the tenant, or by Hibiscus out of their own funds. Therefore, according to Head, the $7.25 per square foot remaining in the loan was sufficient to cover the cost, to the loan fund, of completing the tenant improvements. The Pension Fund adduced no evidence to contradict Head's testimony on this point. The Fund called no witness to testify that the Retail Tenant Improvements budget item was intended to fund the entire cost of tenant improvements, rather than an allowance of $7.25 per square foot. Nor did the Fund adduce any documentary evidence to this effect. Therefore, Head's testimony that the Retail Tenant Improvement dollars were merely a $7.25 per square foot allowance was not controverted.
 
 
 49
 A court should not generally grant a directed verdict based solely on the favorable testimony of an interested witness, even if this testimony is uncontroverted. American Hardware Mut. Ins. Co. v. Vick, 268 F.2d 183, 184 (5th Cir.1959). However, a directed verdict is appropriate where the uncontroverted testimony of an interested witness is inherently plausible and corroborated by other evidence. Brown v. Ford Motor Co., 479 F.2d 521, 523 (5th Cir.1973). We find Head's explanation that the Tenant Improvement budget was a $7.25 square foot allowance plausible. Moreover, substantial evidence corroborates Head's testimony. First, the testimony of other witnesses supports Head's story. Both Louise McKenna, HAL's bookkeeper and secretary, and James Head, project manager in charge of tenant improvements (and Tom Head's brother), testified that tenant improvement dollars were treated as a $7.25 per square foot allowance.[14] Second, the documentary evidence supports Head's claim. The draw requests show that HAL requested only $7.25 per square foot for Tenant Improvements even though those improvements generally cost HAL more than $7.25 per square foot. It defies logic that HAL would not request full reimbursement if, as the Fund asserts, the Retail Tenant Improvement budget was to fund the entire cost of the improvements. Moreover, the tenant leases for the shopping center detail the amount the landlord will contribute to tenant improvements. It is uncontested that these leases contained landlord contribution amounts which are greater than $7.25 per square foot for tenant improvements, and that each of these leases was sent to MIG. Third, the Modification itself supports Head's testimony. The Modification allowed the Guarantors to count "Additional Tenant Improvement" dollars toward the requirement that the Guarantors infuse over $300,000 in "new cash." It is not likely that the Fund would permit the expenditure of additional funds on tenant improvements to satisfy the Guarantor's obligations under the Modification if, as the Fund asserts, the Tenant Improvement budget in the Loan Agreement already covered the entire expense of tenant improvements. We conclude that the court properly directed a verdict in favor of the Guarantors on this issue.[15]
 
 B. Attorney's Fees
 
 50
 The Fund also requests that we review the district court's order granting attorney's fees to plaintiffs as prevailing Florida RICO defendants pursuant to Fla.Stat. Sec. 895.05(7). The amount of the fee award has not been determined and, therefore, the award is not final. Fort v. Roadway Exp., Inc., 746 F.2d 744, 747 (11th Cir.1984). Although we have discretion as an exercise of pendant appellate jurisdiction to review the issue, Andrews v. Employees' Retirement Plan of First Alabama Bancshares, 938 F.2d 1245, 1247-48 (11th Cir.1991), we decline to exercise that discretion here.
 
 V. CONCLUSION
 
 51
 In sum, with respect to the issue concerning the rescission of the Modification, we reverse the district court's grant of JNOV and a limited new trial, and order that the court reinstate the jury's verdict in the first trial. We also instruct the district court to return the parties to status quo by ordering the Fund to return to the appropriate plaintiffs any money spent under the Modification. Finally, we affirm the directed verdicts on the federal and Florida RICO claims, and on the issue of the loan's conversion from a construction to a permanent loan.
 
 
 52
 AFFIRMED in part, REVERSED in part and REMANDED for proceedings consistent with this opinion.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Gerald Wochna and Thomas Head are HAL's partners and HDI's sole shareholders. HDI is HAL's general partner
 
 
 [2]
 The entire leasable space of the Oaks, 98,720 square feet, included both retail space and restaurant space. Tenant improvements for restaurant space were funded under the separate budget item, Restaurant Tenant Improvements, and are not at issue in this appeal
 
 
 [3]
 Because the district court had ruled that the Pension Fund had waived the requirements for conversion of the construction loan to a permanent loan, $2.12 million was the maximum possible award against the Guarantors
 
 
 [4]
 The Pension Fund also argues that the district court erred in granting a remittitur to the plaintiffs in the amount of $519,000 following the second trial. The district court reasoned that the remittitur was required because, under the terms of the Modification, the Guarantors were entitled to a dollar for dollar setoff for any funds plaintiffs invested in the Oaks. Because we reinstate the verdict in the first trial that the Modification has been rescinded, the Guarantors are no longer entitled to any setoff under the Modification. Therefore, this issue is moot
 Additionally, by cross-appeal, plaintiffs assert that there was no evidentiary basis for the jury's verdict in the first trial, and that the district court abused its discretion in denying a motion for Rule 11 sanctions against the Pension Fund made by Joyce Wochna and Rita Head. These claims are without merit.
 
 
 [5]
 The jury answered in the affirmative to the following interrogatory: "Do you find in favor of the Fund and against the plaintiffs (HAL and the Guarantors) on the Fund's assertion that the Modification Agreement is null and void because plaintiffs breached a substantial provision going to the heart of the Agreement?"
 
 
 [6]
 The charge that the district court gave to the jury is as follows:
 The Fund claims as its second defense to the plaintiffs' claim under the Mortgage Loan and Guaranty Agreement that the Agreement is void because of the plaintiffs' substantial breach of the Modification Agreement which renders the Modification a nullity.
 In order for the Fund to establish this defense, it must prove by a preponderance of the evidence that the plaintiffs breached a substantial and important, not a minor, part of the Mortgage Loan and Guaranty Modification Agreement which breach goes to the heart of the Modification Agreement and entitles the Fund to treat the Modification as null and void.
 A substantial breach of a contract is a breach of such magnitude or seriousness that the purpose of the contract has been thwarted or rendered incapable of performance. This would discharge the Fund from its further obligations under the Modification Agreement and require that the parties' obligations be determined under the original loan documents.
 
 
 [7]
 In other words, the district court applied its erroneous perception of what the Florida law required for rescission and held that no reasonable jury could find rescission under that standard
 
 
 [8]
 In addition, the district court shall determine which of the plaintiffs are entitled to the return of such monies, if that determination has significance
 
 
 [9]
 The district court's oral ruling on this issue is couched in terms of "waiver" and the parties dispute whether there was an intentional relinquishment of a known right, and whether the judge could rule "sua sponte" on this issue. However, we need not address these arguments because a careful reading of the record persuades us that the substance of the district court's ruling is that there was insufficient evidence to present the conversion question to the jury
 
 
 [10]
 The "slab" is the concrete floor of the building
 
 
 [11]
 We are not concerned that cross-examination by the Fund revealed that Clark had not read the Loan Agreement and, therefore, could not know how "substantial completion" was defined in the agreement. As already discussed, "substantial completion" under the Loan Agreement refers to completion of the building shell. As Clark's testimony was that the shell was complete, his knowledge of the Agreement is irrelevant
 
 
 [12]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209
 
 
 [13]
 The Florida RICO statute, Fla.Stat.Ann. ch. 895, is patterned after the federal RICO statute, and the same standards apply under both statutes. State v. Nishi, 521 So.2d 252, 253 (Fla. 3d Dist.Ct.App.), review denied, 531 So.2d 1355 (1988)
 
 
 [14]
 These witnesses, as employees of HAL, are arguably "interested." However, as they are not parties to this action, they are substantially less interested than Tom Head and therefore, their testimony could support a directed verdict. See Brown, 479 F.2d at 523 (Noting that the Supreme Court, in Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983 (1931), found that the fact that a witness was an employee of a party-litigant did not create a jury question as to his veracity.)
 
 
 [15]
 The Pension Fund also asserts that the court erred in excluding Dowling's testimony on the RICO claims. The Fund proffered that Dowling would testify that the tenant improvements cost more than $7.25 per square foot. Because this fact had already been established by prior witnesses, we cannot conclude that the district court erred in excluding Dowling's testimony as cumulative. Fed.R.Evid. 403. Moreover, Dowling was not a party to the loan transaction and, therefore, could not testify as to whether certification that $7.25 per square foot remained in the fund for tenant improvements was fraudulent or, as Head testified, merely reflected that only $7.25 per square foot was allocated in the loan for tenant improvements