**Barbara Jean HARPER and Kenneth Harper, Plaintiffs,**

v.

**The CITY OF DOTHAN, ALABAMA, Defendant.**

**No. 1:03–CV–84–F.**

United States District Court, M.D. Alabama, Southern Division.

Oct. 15, 2004.

James Earl Finley, Trussville, AL, for Plaintiff.

Derel Kevan Kelly, The City of Dothan, Dothan, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER

FULLER, Chief Judge.

Officers of the City of Dothan Police Department allegedly violated the consti-

tutional rights of Barbara and Kenneth Harper (hereinafter collectively "Plaintiffs"). Plaintiffs filed suit against the City of Dothan, Alabama (hereinafter "the City") and one of the police officers. This cause is before the Court on the Defendant's Motion for Summary Judgment (Doc. # 8) filed by the City. In this motion, the City argues that it is entitled to summary judgment because Plaintiffs have not presented evidence that would support their allegations that an official policy or custom of the City was the moving force behind Plaintiffs' alleged injuries. The Court agrees and finds that the motion for summary judgment is due to be GRANTED for the reasons set forth in this Memorandum Opinion and Order.

## PROCEDURAL BACKGROUND

On January 10, 2003, Plaintiffs Barbara and Kenneth Harper filed suit in the Circuit Court of Dale County, Alabama. The Complaint named two defendants: Terry Singleton (hereinafter "Singleton") and the City.[1] After being served with the Complaint, the City promptly removed the case to this Court. After Plaintiffs failed to serve Singleton, this Court dismissed him from this action. Thus, the City is the sole remaining defendant in this case. The City seeks summary judgment on Plaintiffs' claims.

## JURISDICTION AND VENUE

Jurisdiction over Plaintiffs federal claims is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both personal jurisdiction and venue.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, a court ruling on a motion for

---

1. Pursuant to the Alabama Rules of Civil Procedure, the Complaint also included allegations against fictitious defendants. The Complaint has never been amended to identify any of those fictitious defendants.

summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 .U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

## FACTS

The Court has carefully considered all affidavits and exhibits submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to Plaintiffs, the non-moving parties, establish the following relevant facts:

### A. The Incident Out of which the Claims Arise

Barbara Harper and her husband, Kenneth Harper, live at 108 Old Town Road in Midland City, Alabama. Their son, Kenneth Harper, Jr. Lives there with them. Barbara Harper is also the mother of Frazier LaShawn Franklin (hereinafter "LaShawn") and Torrance Franklin ("Torrance").

On January 6, 2001, there was a triple shooting in Dothan, Alabama. Witnesses at the scene of the shooting identified Torrance, LaShawn, and Clinton Walton (hereinafter "Walton") as suspects in the shooting. On January 9, 2001, warrants were issued for the arrest of LaShawn, Torrance, and Walton for Burglary First Degree in connection with the Dothan shootings. The warrants for LaShawn and Torrance listed their residence as 108 Old Town Road, Midland City, Alabama. The members of the Dothan Police Department received information that led them to believe that LaShawn and Torrance could be at their mother's home on 108 Old Town Road in Midland City, Alabama.

On January 11, 2001, Napier Field Chief of Police Bill Simpson began watching the house at 108 Old Town Road. After seeing a male entering the residence who he believed matched one of the suspect's description, he notified the Dothan Police Department. Upon receiving the information from Bill Simpson, Singleton and another member of the Dothan Police Department, Della Williamson (hereinafter "Williamson"), headed for 108 Old Town Road. While they were en route, they received information that the male had left the residence in a white Nissan which matched the description of the vehicle the suspects were driving during the shooting.

Midland City police stopped the white Nissan and asked the driver for identification. The driver was Kenneth Harper, who was on his way to work. According to Kenneth Harper's affidavit, the Midland City police allowed him to get back in his car and he started to leave when a number of police cars from the Dothan Police Department stopped him again. These officers ordered Kenneth Harper to get out of the car with his hands up. Kenneth Harper said that he heard one of the Midland City police officers say that this was not one of the suspects, but was instead the step-father of one of the suspects. According to Kenneth Harper he was surrounded by twenty or thirty police officers who were all pointing shotguns at him. He got out of the vehicle. He was searched and placed in handcuffs and made to lie on the ground while his vehicle was searched.

According to Kenneth Harper, the Dothan police officers put him in a patrol car and drove him to a nearby parking lot. Singleton then introduced himself to Kenneth Harper and asked if Torrance and

LaShawn were at Harper's house. Kenneth Harper told Singleton that they were not. Singleton twice asked Kenneth Harper for consent to search Harper's house, and according to Kenneth Harper's affidavit testimony, he refused to give consent to such a search. There is no evidence before this Court that John White, the Chief of the Dothan Police Department, was present at any point during the period of time when the police had detained Kenneth Harper on the roadside or in the patrol car.

Singleton, Williams and other officers of the Dothan Police Department arrived at 108 Old Town Road. Singleton and Williams spoke to Barbara Harper. She refused to allow them to enter the house. An investigator with the Dale County Sheriff's Department told Singleton and Williams that he was familiar with Torrance and LaShawn and that Barbara Harper had been known to mislead law enforcement about their whereabouts in the past. After about an hour, Kenneth Harper was removed from the police car and handcuffs and told to return home. Kenneth Harper drove home followed and preceded by police cars. He spoke to his wife. Kenneth Harper decided that he would allow either the Dale County law enforcement or the Midland City police could search his residence without a warrant, but that he would not allow the Dothan Police to search the residence without a search warrant. He went outside and asked for a Dale County or Midland City police officer, but he was told that the Dothan Police Department was in charge. Kenneth Harper told his wife to call any Dale County or Midland City officer to come and search the house and she began calling. Kenneth Harper attempted to leave for work, but the Dothan Police blocked his attempts to leave. After repeated attempts to leave and a call to his attorney, Kenneth Harper successfully left for work arriving there about 3:00 p.m.

Meanwhile having been informed that the Harpers would not consent to a search of their residence without a search warrant, Williams spoke to an investigator with the Dale County Sheriff's Department named Butch Jones. Jones called Dale County Judge Fred Steagall and informed him of the situation. At 1:40 p.m., Judge Steagall issued a search warrant which authorized police officers to enter the house at 108 Old Town Road looking for Torrance, LaShawn, or Walton.

Lieutenant David Kirkland of the Dothan Police Department arrived on the scene and was told of the situation. Because all three suspects were considered armed and dangerous, Lieutenant Kirkland called the Dothan Police Department Special Response Team to execute the search warrant on the house. Around 2:00 p.m., John White, the Chief of the Dothan Police Department arrived in the subdivision where Plaintiffs' house is located. From a distance vantage point, he watched the subsequent events on the scene. From this vantage point, he did not observe any violation of any of the Dothan Police Department's policies or procedures or any violations of any state or federal laws.

Sergeant David Jay, a crisis negotiator with the Dothan Police Department, called Barbara Harper on the telephone and told her that he was in charge of the task force and they were going to search her house.[2] There is no evidence before this Court that Chief John White heard any part of the telephone conversation between Sergeant Jay and Barbara Harper. Sergeant David Jay told Barbara Harper that there were snipers around the house with guns and

---

2. Although the Complaint alleges that this telephone call was made by Singleton, the undisputed evidence before this Court establishes that Jay, not Singleton, made the call.

that if she didn't cooperate she could be shot. He then told her to open the door and walk towards the man waiving his hand and he would show her the search warrant. Barbara Harper told him that she was not feeling well and that she was not dressed to come outside because she only had on pajamas and a robe. He told her that it would take a few minutes and that she should come out.

Barbara Harper and a female friend who had been visiting her walked to the police officer. A female police officer searched the two women. The police told Barbara Harper that it would be a few minutes. After waiting about ten minutes, Barbara Harper asked when they were going to get to see the search warrant and was told it would be a few more minutes. She announced that she was going to go back into her house. According to Barbara Harper's affidavit, a police officer[3] grabbed her, slammed her face down on a vehicle, handcuffed her and shoved her to the side of the vehicle. Barbara Harper asked why she was being handcuffed and one of the police officers said that she might be under arrest in a minute. Barbara Harper then had to wait outside in the rain in her pajamas.

After about five minutes a truck drove up to the back door. About ten or fifteen men ran up to the Harpers' door and knocked it down. Barbara Harper heard a loud bang and then smoke billowed out of her house. The entry team searched and secured the house and the attic crawl space. They did not find anyone during the search.

Barbara Harper became faint and extremely cold. Someone called an ambulance to come to her aid. The ambulance took her to Flowers Hospital where she was examined and released with a prescription for medication for her nerves. Around 4:30 or 5:00 p.m., Barbara Harper called Kenneth Harper at work and told him that the police had entered and searched the house, in the process destroying it and that she was at the hospital. While checking on Barbara Harper at the hospital, Kenneth Harper learned that his son, Kenneth Harper, Jr. was at the Midland City Police Department.[4]

3. According to the allegations of the Complaint, Plaintiffs seek to recover from the City for the actions of Singleton pursuant to an official policy or custom endorsed or approved by the City. The police officer who grabbed Barbara Harper, slammed her face down on a vehicle, handcuffed her and shoved her to the side of the vehicle in the mud is not identified in any of the evidentiary materials before the Court. The police witnesses deny seeing Barbara Harper slammed into a vehicle. Barbara Harper's friend Felicia Wilkerson, who was present at the time, does not mention Barbara Harper being slammed into a vehicle. Instead, Wilkerson's affidavit indicates that "they" grabbed and threw Barbara Harper to the ground in the mud and handcuffed her. Only Barbara Harper's affidavit indicates that an unidentified officer grabbed her, slammed her face down on a jeep, handcuffed her, and shoved her to the side of the jeep. Because of the procedural posture of this case, the Court must credit Barbara Harper's account. Nevertheless, the Court finds it significant that Barbara Harper did not identify Singleton as the officer who grabbed her and cuffed her. Indeed, in numerous places in her affidavit Barbara Harper does identify Singleton as having made certain statements or taken certain actions. It is obvious from this that Barbara Harper is perfectly capable of identifying the actions and statements of Singleton. In these circumstances, there is no evidence from which a reasonable fact-finder could find that Singleton was the officer who grabbed Barbara Harper and cuffed her.

4. According to Kenneth Harper, Jr., who is not a party to this action, he was stopped by members of the Dothan Police Department and asked for identification and then cuffed and placed in a police car. While he was in the police car, he became upset about how he had been treated, how is mother was being treated, and how things were happening and he began screaming and kicking the window of the police car. After he kicked out the

When she returned home, Barbara Harper found that her home had been damaged by the search. She claims that a flash grenade used inside her home burned her carpet. Some house plants had been overturned and photographs had fallen off of the walls. She claims property damage of $7,315.74. She also claims her insurance company cancelled her coverage "presumably because of the damage."

## B. Relevant Policies and Procedures of the City of Dothan Police Department

### 1. Hiring

The City has policies and procedures which govern the hiring of officers for the City's Police Department. Applicants to the Dothan Police Department are required to complete an employment application, to pass a civil service examination, to undergo a criminal background check and a driver's history inquire. Applicants must also undergo physical and psychological evaluations and answer questions posed by a candidate interview panel. Applicants must also take a polygraph examination. These hiring policies and procedures are intended to ensure that qualified applicants are hired.

### 2. Training

Upon entering employment with the City's Police Department, each police officer is issued a set of Procedural General Orders to be used as basic guidelines in the performance of their daily duties. Each police officer is responsible for reviewing, understanding, maintaining, and complying with all orders. According to the sworn testimony of the Chief of Police for the City, none of the Police Department policies violate a citizen's rights or

evidences deliberate indifference to the constitutional rights of the citizens.

The State of Alabama requires officers to complete twelve hours additional training each year to remain certified by the Alabama Peace Officers Standards and Training Commission. The City's Police Department has established a training division for the sole purpose of providing instruction and ensuring that officers are updated on various law enforcement curricula. In 2000, Singleton received thirty hours of training, an amount well in excess of the required twelve hours.

### 3. Supervision

The City Police Department has an Internal Affairs Division. That division investigates all complaints made against police officers. Any officers found to have violated state or federal law, the policies and procedures of the City or the Dothan Police Department are subject to discipline pursuant to the City's Civil Service Act. There is no evidence before this Court that the City had any prior complaints about Singleton's conduct. Indeed, there is no evidence before this Court about any prior complaints of a similar nature made about any officer of the City's police department.

## DISCUSSION

Individuals seeking redress in the courts for violations of their constitutional rights may not sue directly under the United States Constitution. Rather, they must make a claim under 42 U.S.C. § 1983. Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes

window of the police car, a member of the Dothan Police Department sprayed mace in his face, snatched him out of the car, and

slammed him on the ground. He was eventually taken to the Midland City Police Station.

to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In this case, Plaintiffs bring suit against the City pursuant to § 1983 for alleged deprivations of Plaintiffs' "legal rights guaranteed to them by the Constitution and Laws of the United States in that the officer unlawfully searched and unlawfully detained the plaintiffs causing property damage, personal injuries and mental anguish." Compl. at ¶ 4. In *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court decided that a municipality can be found liable under § 1983, however, in so doing, the Supreme Court placed limitations on the circumstances in which such liability would be appropriate.

 To the extent that Plaintiffs seek to bring claims against the City pursuant to 42 U.S.C. § 1983, they must overcome the "strict limitations on municipal liability" which the United States Supreme Court has put in place. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.), *cert. denied,* 525 U.S. 870, 119 S.Ct. 165, 142 L.Ed.2d 135 (1998). Under § 1983, there is no *respondeat superior* liability; a

municipality may not be sued under § 1983 for the acts of others. *See Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Brown v. Neumann,* 188 F.3d 1289, 1290 (11th Cir. 1999) ("A governmental entity is not liable under § 1983, merely as a matter of *respondeat superior,* for constitutional injuries inflicted by its employees."); *Gold,* 151 F.3d at 1350 (municipality may not be liable for the wrongful actions of its police officers pursuant to a *respondeat superior* theory of liability). "Instead, a municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation." *Gold,* 151 F.3d at 1350. It is incumbent upon a plaintiff seeking to hold a municipality liable pursuant to § 1983 to "identify a municipal 'policy' or 'custom' that caused [his] injury." *Id.* A municipality may *only* be held liable under § 1983 "when 'the execution of the government's policy or custom ... inflicts the injury.'" *Id.* Put another way, a plaintiff seeking to recover pursuant to § 1983 from a municipality must demonstrate that the official policy or custom [5] was the "moving force of the constitutional violation." *See, e.g., City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "Thus, at the very least, a plaintiff must identify a municipal policy and then dem-

---

5. In *Brown v. City of Ft. Lauderdale,* 923 F.2d 1474 (11th Cir.1991), the Eleventh Circuit explained that a plaintiff can establish municipal liability under § 1983 in either one of two ways. First, liability may attach if a plaintiff demonstrates "a widespread practice that, 'although not authorized by written law or express municipal policy, causes a constitutional deprivation and is so permanent and well settled as to constitute a custom and usage with the force of law.'" *Id.* at 1481 (quoting *Praprotnik,* 485 U.S. at 127, 108

S.Ct. 915). Second, a plaintiff can establish a municipality's liability by showing that his or her alleged constitutional injury was caused by a person who "possess[ed] 'final authority to establish municipal policy with respect to the action ordered.'" *Id.* at 1480 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)); *see also Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Church v. City of Huntsville,* 30 F.3d 1332, 1337 (11th Cir.1994).

onstrate an affirmative link between the policy and the particular violation alleged." *Griffin v. City of Clanton, Ala.,* 932 F.Supp. 1359, 1370 (M.D.Ala.1996) (citing *Tuttle,* 471 U.S. at 823, 105 S.Ct. 2427).

In applying this doctrine to this case, the Court is mindful of the Eleventh Circuit's admonition regarding the extent of municipal liability in cases such as this one. The official policy or custom requirement means that

> the City is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated [plaintiffs'] constitutional rights. Instead, the Supreme Court has explained that there are only "limited circumstances" in which an allegation of failure to train or supervise can be the basis for liability under § 1983. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.

*Gold,* 151 F.3d at 1350 (internal citations omitted).

Due to its very broad and vague language, it is not possible to discern from the Complaint itself which specific policy or custom of the City allegedly cause the Plaintiffs' injuries. Although some cases for alleged police misconduct identify a problem with the policies or customs relating to hiring, it appears from the submissions on summary judgment in this case that this is not such a case. Instead, Plaintiffs focus on alleged inadequacies in training and supervision of Singleton. Thus, the Court must turn its focus to the adequacy of Plaintiffs' claims that the City should be held liable due to alleged inadequacies in its training and supervision of its police officers. In so doing, the Court

is hampered somewhat by Plaintiffs failure to identify specific areas of alleged deficiencies in the training and supervision of the officers. This Court will not "infer the existence of a culpable policy from the actions of the individual officers in this case." *Griffin,* 932 F.Supp. at 1370–71.

■ Inadequate police training or supervision by a municipality can rise to the level of a "policy or custom" that is actionable under § 1983 where the failure to train amounts to "deliberate indifference" to the rights of persons in the jurisdiction. *See, e.g., City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Gold,* 151 F.3d at 1350; *Griffin,* 932 F.Supp. at 1370.

> To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise *in a particular area* and the municipality made a deliberate choice not to take any action. [The Eleventh Circuit Court of Appeals] repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise.

*Gold,* 151 F.3d at 1350–51 (internal citations and footnote omitted; emphasis added). This high standard of proof is "intentionally onerous" for plaintiffs because to require less would be to allow a result never intended by the United States Supreme Court, namely, subjecting a municipality to liability on the basis of *respondeat superior. Id.* at 1351 n. 10. The Eleventh Circuit Court of Appeals has required that the municipality's knowledge of a need for training or supervision in a particular area arise out of knowledge or awareness of a history of widespread *prior* abuse or a *prior* incident in which constitutional rights were similarly violated. *Id.* at 1351

(surveying cases). "Deliberate indifference by a municipality cannot be demonstrated merely by examining the actions of police officers during a single incident of unconstitutional conduct." *Griffin,* 932 F.Supp. at 1371. Absent such evidence of *prior* incidents, a municipality cannot have been deliberately indifferent to the need to train and supervise in a particular area unless the need was so obvious and the likelihood of constitutional violations was highly predictable. *Id.* at 1351–52. Thus far, such cases have been limited to the use of deadly force when firearms are provided to police officers. *Id.* at 1352.

Rather than pointing to some deficiency in the written policies or procedures of the City with respect to training or supervision of officers or offering evidence of prior incidents of similar constitutional violations, Plaintiffs attempt to establish a basis for municipal liability by arguing that the Chief of the City's Police Department and arguably its policymaker, John White, was present on the scene when some of the allegedly unconstitutional actions of the officer occurred and failed to either recognize that the actions constituted deprivations of Plaintiffs' constitutional rights or to remedy those deprivations. Indeed, Plaintiffs make much of the fact that both Chief White and other officers of the City's police department have provide affidavits in which they aver that they did not observe any violation of any policy of the City's police department. This is the entire basis for Plaintiffs' assertion that the City may be held liable pursuant to § 1983 for what Plaintiffs contend are numerous violations of their constitutional rights.

██ It is the finding of this Court that even viewing all evidence in the light most favorable to Plaintiffs,[6] they cannot establish an appropriate basis for municipal liability in this case under the applicable law as set forth by decisions of the United States Supreme Court and Eleventh Circuit Court of Appeals. Although Plaintiffs' brief pays lip-service to the applicable law at the end of the day, their arguments are really premised on a *respondeat superior* argument. It is beyond clear that such an argument is not an appropriate basis for municipal liability pursuant to § 1983. Plaintiffs have utterly failed to established the required predicate for their claims against the City. Accordingly, the City is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion and Order, Defendant's Motion for Summary Judgment (Doc. # 8) is GRANTED. The Court will enter a separate final judgment in favor of the City consistent with this Memorandum Opinion and Order.

## *FINAL JUDGMENT*

In accordance with the Memorandum Opinion and Order entered this date, it is the ORDER, JUDGMENT and DECREE of the Court as follows:

(1) With respect to all claims in this action, judgment is ENTERED in favor of Defendant The City of Dothan, Alabama and against Plaintiffs Barbara Jean and Kenneth Harper, with Plaintiffs taking nothing by their claims.

(2) Costs are TAXED against Plaintiffs Barbara Jean and Kenneth Harper, for which execution may issue.

---

**6.** While it is clear that some issues exist as to certain facts in this case, the Court finds that the factual disputes are not material to the basis of its finding that Plaintiffs cannot establish a predicate for municipal liability in this case. For purposes of this motion, the Court has accepted the facts as set forth by Plaintiffs even when the City has disputed them. Thus, this is not a case in which a genuine issue of material fact precludes summary judgment.

(3) The Clerk of the Court is DIRECTED to enter this document on the civil docket sheet as a Final Judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure and to close this file.