United States Court of Appeals,

Eleventh Circuit.

No. 96-5395.

Michael C. GOLD, Plaintiff-Appellee,

v.

CITY OF MIAMI, Defendant-Appellant.

Aug. 27, 1998.

Appeal from the United States District Court for the Southern District of Florida. (No. 92-1673-CV-JWK), James W. Kehoe, Judge.

Before COX and HULL, Circuit Judges, and FAY, Senior Circuit Judge.

HULL, Circuit Judge:

Appellant Michael C. Gold ("Gold") brought a false arrest claim under state law and civil rights actions based on excessive force and arrest without probable cause under section 1983. 42 U.S.C. § 1983. Gold originally sued the City of Miami (the "City"), three City police officers, and the City Police Chief. In an earlier appeal, this Court held that the three City police officers and the City Police Chief were entitled to qualified immunity. *Gold v. City of Miami,* 121 F.3d 1442 (11th Cir.1997) ("*Gold I* ").

While the earlier appeal was pending, Gold's case against the City proceeded to trial. The jury returned a verdict for Gold on both his federal and state claims. The City challenges the jury's verdict on only Gold's section 1983 claims, contending that the district court erred in not granting the City's motions for judgment as a matter of law. After review, we agree and set aside the verdict against the City on Gold's section 1983 claims.

I. FACTUAL BACKGROUND

A. The Arrest

Gold pulled into a congested bank parking lot so that his passenger could use the bank's automated teller machine ("ATM").[1] While waiting for a parking space to open up, Gold noticed a uniformed police officer nearby. Gold also noticed a woman who did not appear to be handicapped walk to her car parked in a handicapped space, get in, and start to drive away. Disturbed by this, Gold yelled to the officer, "Aren't you supposed to give her a ticket for something like that?"[2] The officer did not respond. Gold then found a parking space, parked his car, walked toward the ATM, and loudly remarked to no one in particular, "Miami police don't do shit."

Upon hearing Gold's remark, a plainclothes officer who had been standing in the ATM line stated to the uniformed officer, "Hey, I think he's got a problem."[3] Gold replied, "I don't have a problem. I'm just saying that Miami police don't do shit." A different plainclothes officer who had been standing next to the uniformed officer then approached Gold and asked him for identification. After Gold produced his Florida driver's license and Florida Bar membership card, the officer headed toward the uniformed officer's patrol car to do a radio-check on the identification. The officer soon was joined by the uniformed officer and the other plainclothes officer.

---

[1] The evidence at trial, construed in the light most favorable to Gold, is similar in all material respects to the facts recited in *Gold I. See* 121 F.3d at 1444. Thus we repeat *Gold I* 's recitation of the facts except where the evidence at trial was different.

[2] Gold's trial statement is slightly different from his deposition statement at the summary judgment stage, which was, "Aren't you supposed to give them a ticket for parking in a handicapped spot?" *See Gold I,* 121 F.3d at 1444.

[3] Gold's trial statement is slightly different from his deposition statement at the summary judgment stage, which was, "I think this guys [sic] got a problem." *See Gold I,* 121 F.3d at 1444.

Upon observing all of this, a couple walking away from the ATM machine made a comment on the situation, and Gold responded, "They'll do what they're going to do."[4] Gold then walked over to the two plainclothes policemen and one uniformed policeman now gathered around the squad car. He asked the officer who had his ID, "What's going on?" The officer said, "Shut up," but Gold insisted, "I'd like to know what's going on here." The officers then placed Gold under arrest for disorderly conduct.[5] The City concedes that Gold's arrest was without probable cause. *See Gold I,* 121 F.3d at 1445-46.[6]

B. The Handcuffing

After handcuffing Gold, the uniformed officer assisted Gold into the back of his patrol car. Some moments later, Gold complained that the handcuffs were so tight that he was in pain.[7] The officer did not loosen the handcuffs until roughly fifteen to thirty minutes after Gold complained. As a result, Gold claims that he had numbness on his right wrist lasting a day or two. Gold admits

---

[4]*Gold I* states that the couple was in line at the ATM and that Gold talked to the couple for a few minutes. *Gold I,* 121 F.3d at 1444. At trial, Gold testified that the couple was walking away from the ATM when the woman made a comment and Gold responded as noted above. Also, *Gold I* includes the substance of the couple's comment. *Id.* At trial, the comment was excluded as hearsay.

[5]Although Gold put his hands behind his back without resistence, the officers also charged him for "resisting arrest without violence." However, Gold did not argue to the district court-and does not argue on appeal-that the officers violated his constitutional rights by falsely charging him with resisting arrest. Therefore, this Court does not address this issue.

[6]Florida's disorderly conduct statute applies only when speech by its very utterance inflicts injury or tends to incite an immediate breach of the peace. *Gold I,* 121 F.3d at 1445-46. Speakers do not violate the statute "merely by annoying those around them or by employing profane language to express outrage." *Id.* at 1445.

[7]Rather than double-locking the metal cuffs such that they would remain at a fixed circumference, the officer had single-locked them, so that they could ratchet down and decrease in circumference while on Gold's wrists.

3

that he did not notice that his skin was broken until he left the jail that day. Gold did not see a doctor regarding any problems resulting from the incident. After five or six hours in custody, Gold was released. The State later dropped the criminal charges against him.

C. The Police Officers' Training

At trial, the evidence showed that the City's police officers underwent substantial training at the police academy and afterwards on a wide variety of topics. The City police department exceeded the State of Florida's required number of training hours, and it established departmental rules and regulations and standard operating procedures. Each police officer received a law enforcement handbook and significant instruction on the implementation of Florida criminal law. Each police officer also received updates on recent changes in Florida statutory and case law that the police department's legal advisor thought would affect the officers' operations. Although no one recalls any specific training about the disorderly conduct statute or the constitutional limitations placed by the Florida Supreme Court on that statute in *State v. Saunders,* 339 So.2d 641 (Fla.1976), the disorderly conduct statute was in the officers' handbook for their review.[8] The Police Chief and the legal advisor testified that they were not aware of any problem with arrests under the Florida disorderly conduct statute or with the responses to handcuff complaints that would call for any specialized training on these specific issues.

---

[8]Florida's disorderly conduct statute reads:

> Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree....

Fla. Stat. Ann. § 877.03 (1994).

4

Gold presented no evidence of any prior false arrest for disorderly conduct or a prior citizen complaint of such a false arrest. Gold presented evidence only (1) that City officers often heard profanities and verbal insults while on patrol; (2) that they brought the incidents to the Police Chief's attention; and (3) that they filed 8,201 disorderly conduct arrests between 1986 and 1991 (not including sealed and expunged cases). However, Gold presented no evidence connecting the profanities and insults to any disorderly conduct arrests.

Gold also presented no evidence of any prior incidents of improper responses to handcuff complaints. Gold presented only evidence that other officers often loosened handcuffs upon request and evidence of one injury due to handcuffing but no showing that this one injury was caused by excessive force or improper handcuffing.

D. Jury's Verdict

Answering special interrogatories, the jury found that Gold's arrest was caused by a City policy that reflected deliberate indifference by the City to Gold's civil rights through a failure to train and/or supervise police officers concerning the disorderly conduct statute and the proper response to handcuff complaints. The jury awarded Gold $26,000 in damages on his section 1983 claim arising from the disorderly conduct arrest, $500 in damages on his section 1983 claim for excessive force in handcuffing, and $26,500 on his state law claim for false arrest. Since the federal and state claims involved the same damages, the district court entered judgment against the City for total damages of $26,500. The court also awarded Gold $59,420 in attorneys' fees under 42 U.S.C. § 1988, and taxed $8,303.78 in costs against the City.

The court denied the City's motion for judgment as a matter of law, which was made at the close of Gold's evidence, renewed at the close of all evidence, and made again post-trial.[9] The City does not contest the jury's verdict on the state law claim for false arrest but challenges only the verdict on Gold's section 1983 claims.

## II. STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion for judgment as a matter of law. *See Hibiscus Assocs. v. Board of Trustees of the Policemen and Firemen Retirement Sys.,* 50 F.3d 908, 920 (11th Cir.1995). This Court employs the same standard the district court applied, "review[ing] all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995). Although the existence of a genuine issue of material fact precludes judgment as a matter of law, "a jury question does not exist because of the presence of a mere scintilla of evidence." *Id.* A motion for judgment as a matter of law will be denied only if "reasonable and fair-minded persons in the exercise of impartial judgment might reach contrary conclusions." *Id.*

## III. DISCUSSION

A. Municipal Policy Requirement

The Supreme Court has placed strict limitations on municipal liability under section 1983. There is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers in making a false arrest. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a municipality may be held liable for the

---

[9]The district court also denied the City's motion for summary judgment, but the City did not appeal along with the other parties in *Gold I. See* 121 F.3d at 1444 & n. 2.

actions of a police officer only when municipal "official policy" causes a constitutional violation. *See id.* at 694-95, 98 S.Ct. 2018. Gold must "identify a municipal "policy' or "custom' that caused [his] injury," *Board of County Com'rs v. Brown,* 520 U.S. 397, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018); "It is only when the "execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Thus, the City is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated Gold's constitutional rights. Instead, the Supreme Court has explained that there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983. *See City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights. *Id.* at 389-91, 109 S.Ct. 1197; *see also Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1555 (11th Cir.1989); *Brown,* at ----, ----, 117 S.Ct. at 1388, 1390.

Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants, as follows:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under § 1983 only where its policies are the

7

"moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

*City of Canton,* 489 U.S. at 388-89, 109 S.Ct. 1197 (internal citations omitted).

To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. *See Board of County Com'rs v. Brown,* 520 U.S. 397, ---- - ----, 117 S.Ct. 1382, 1390-91, 137 L.Ed.2d 626 (1997); *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1171-72 (11th Cir.1995); *Church v. City of Huntsville,* 30 F.3d 1332, 1342-46 (11th Cir.1994); *Wright v. Sheppard,* 919 F.2d 665, 674 (11th Cir.1990); *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556-57 (11th Cir.1989).[10] This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a

---

[10]This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained,

> [t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities....

> *Id.* at 391-92, 109 S.Ct. 1197; *see also Brown,* at ----, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").

8

municipality is not liable as a matter of law for any failure to train and supervise.[11]  For example, in *Wright v. Sheppard,* 919 F.2d 665 (11th Cir.1990), this Court held that a sheriff's department was not liable for a deputy's acts when "no evidence of a history of widespread prior abuse ... put the sheriff on notice of the need for improved training or supervision."  *Id.* at 674.  Indeed, in *Church v. City of Huntsville,* 30 F.3d 1332 (11th Cir.1994), this Court reversed a district court's preliminary injunction against the City of Huntsville, holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated.  *Id.* at 1342-46.  *See also Popham v. City of Talladega,* 908 F.2d 1561, 1564-65 (11th Cir.1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train).  More importantly, in *Brooks v. Scheib,* 813 F.2d 1191 (11th Cir.1987), even though there had been ten citizen complaints about police officer Scheib, this Court held that the City did not have any notice of past police misconduct because the plaintiff "never demonstrated that past complaints of police misconduct had any merit."  *Id.* at 1193.  This Court aptly noted, "Indeed, the number of complaints bears no relation to their validity."  *Id.*

B. Gold Presented No Evidence of Prior Incidents

Gold admits that he presented no evidence of prior constitutional violations or false arrests involving Florida's disorderly conduct statute.  Instead, Gold submitted evidence only that there were 8,201 disorderly conduct arrests between 1986 and 1991 and that 601 such arrests were

---

[11]In granting qualified immunity to Police Chief Ross, the *Gold I* court found no evidence that the Police Chief was deliberately indifferent in failing to train the three arresting officers because the court found no indication in the summary judgment record "that a reasonable person in Ross's position would have known that such a failure infringed on constitutional rights."  121 F.3d at 1447.

dismissed and 700 such arrests were nol prossed. There was no evidence regarding the reasons for these dispositions or that any such dispositions were due to false arrests for only protected speech. Gold, an attorney, admitted that there can be many reasons why a criminal case is dismissed, such as failure of witnesses or police officers to appear. Both the City's Chief of Police and its Internal Affairs investigator also testified that they could not recall any pattern of complaints for false arrest under the disorderly conduct statute.

Similarly, Gold presented no evidence of a single prior incident in which a City police officer caused an injury by excessive force in handcuffing. Gold presented only evidence that other officers often loosened handcuffs upon request and evidence of one injury due to handcuffing, without any showing of excessive force involved.

C. No Obvious Need

Gold stresses that evidence of prior incidents is not required to establish a city policy in this case because the need to train and supervise in the particular areas in issue was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident. In *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court in dictum left open the possibility that a need to train could be "so obvious," resulting in a City's being liable without a pattern of prior constitutional violations. *Id.* at 390, 109 S.Ct. 1197. As an example, the Supreme Court in *City of Canton* referenced the obvious need to train police officers on the constitutional limitations on the use of deadly force, when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons. *Id.* at 390 n. 10, 109 S.Ct. 1197.

10

Subsequently, in *Board of County Commissioners v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court characterized the *City of Canton* 's leaving open such a possibility as simply hypothesizing in a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations, as follows:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply *hypothesized* that, *in a narrow range of circumstances,* a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.

*Brown,* at ----, 117 S.Ct. at 1391 (emphasis added) (holding isolated incident of sheriff's inadequate screening of deputy did not create such an obvious risk that it alone established the municipality's deliberate indifference to the risk that the deputy would use excessive force). In short, to date, the Supreme Court has given only a hypothetical example of a need to train being "so obvious" without prior constitutional violations: the use of deadly force where firearms are provided to police officers. *See City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197.

In any event, Gold's contentions that the police officers were inadequately trained and/or supervised regarding the disorderly conduct statute and the proper response to handcuff complaints "fall[ ] far short of the kind of "obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city." *City of Canton,* 489 U.S. at 396-97, 109 S.Ct. 1197 (finding no obvious need for police officers to be trained in diagnosing mental illness) (O'Connor, J., concurring in part and dissenting in part); *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1171-72 (11th Cir.1995) (finding no obvious need to train jail employees "to recognize the

11

need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed").[12]

"Unlike the risk from a particular glaring omission in a training regimen," the risk from these possible imperfections, if any, in the City police officers' training and supervision here "is not obvious in the abstract." *Brown,* at ----, 117 S.Ct. at 1391.[13]

D. *Vineyard* Is Not Applicable

Gold also relies heavily on *Vineyard v. County of Murray, Georgia,* 990 F.2d 1207, 1212 (11th Cir.1993), but that decision is inapplicable. Vineyard was threatened and beaten repeatedly in the head and chest by sheriff's deputies while handcuffed to a hospital bed. *Id.* at 1209. Vineyard's jaw was broken, and he underwent two surgical operations and treatment for the pain associated with this injury. *Id.* at 1212. Although "it was not unusual to receive complaints" about

---

[12]In *Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1172 (11th Cir.1995), this Court explained the notice requirement as follows:

> Before it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had "actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." This may be demonstrated in one of two ways.
>
> First, the need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations.
>
> Alternatively, the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.

*Id.* at 1172 (internal citations and parentheticals omitted).

[13]Gold presented expert testimony that the need for training and/or supervision in these two areas should have been obvious to the City and that the City was deliberately indifferent in not responding. However, an expert's conclusory testimony does not control this Court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need.

12

deputies, "the dispatcher or whoever answer[ed] the telephone ha[d] discretion about the initial handling of the complaint." *Id.* Only the two deputies who committed the beating were assigned to investigate Vineyard's complaints. The sheriff's department did not log or document citizens' complaints in any fashion, much less retain records of such complaints. The two deputies never completed an arrest report for Vineyard's arrest during which the beating occurred. The sheriff's department had no policies or procedures manual. *Id.*

Although there was no evidence of prior beatings by the deputies in *Vineyard,* this Court found that there was sufficient evidence from which the jury could find that Murray County's not having a policy and procedures manual, not requiring the deputies to file an arrest report when beatings or confrontations occur, not logging in or documenting in any way citizens' complaints, and not investigating any complaints together were "the moving force" behind the deputies' "use of gratuitous force." *Id.* at 1213. In contrast, the evidence here shows that the City has policies and procedures, has extensive training for its police officers, acquaints the officers with departmental policies and procedures, documents all citizens' false arrest complaints, and retains those records for a considerable period of time.

Gold stresses that the City's failure to investigate false arrest complaints raises a jury issue regarding whether the City was deliberately indifferent to an obvious need to supervise its police officers. However, false arrest complaints are documented but not investigated because the City's position is that the proper authority to investigate and determine whether there was probable cause for an arrest is the courts and not the police department. Moreover, the City's Internal Affairs does investigate excessive force claims and certain other claims of police misconduct. In any event, because Gold presented no evidence of a prior false arrest for disorderly conduct or even a valid

13

complaint of such false arrest, there is no showing that the City's procedures for handling false arrest complaints affected the officers' conduct here. *See Brooks v. Scheib,* 813 F.2d 1191, 1195 (11th Cir.1987) (finding no evidence from which a jury could infer a municipality's deficient procedures for handling citizen complaints were the moving force of the constitutional violation when the plaintiff failed to show that the prior ten "complaints against [officer] Scheib had some merit and that more effective citizens' complaint procedures would have prevented his injuries").

E. The City's Record-Keeping

Lastly, Gold contends that he could not prove a pattern of prior false arrests for disorderly conduct because the City kept no records or inadequate records of citizens' false arrest complaints. At trial, it was undisputed that the City does document all citizens' false arrest complaints and then retains that record as far back as 1985 or 1986. Indeed, when Gold made his complaint, the City documented it, and the contents of that record were introduced at trial.

Although classified as "non-complaints," these reports nevertheless are retained by the City and were available as far back as 1985 or 1986. Thus, the number and nature of the allegations of false arrest for disorderly conduct received by the City since at least 1986 could have been determined by pulling these forms and reading the narratives. Therefore, Gold's claim that the City's record keeping system prevented him from presenting the necessary evidence is not supported by the record in this case. The record also does not show any attempt by Gold to obtain these "non-complaint" files or review them. Gold has failed to establish that the City's method of record-keeping prevented any attempts to prove a prior incident of false arrest for protected speech.[14]

---

[14]Our discussion of this issue does not imply that the City was obligated to keep any such records for the purpose of enabling Gold to prove a claim. However, since the City did document complaints of false arrests, we discuss Gold's contentions about the City's

IV. CONCLUSION

In sum, Gold has not presented any evidence from which the jury could find that the existence of a municipal policy or custom caused or was the moving force behind the violation of Gold's constitutional rights. No facts to sustain the jury's verdict were offered.[15]

The district court erred in denying the City's motion for judgment as a matter of law on Gold's section 1983 claims. Thus, the jury's verdict against the City on Gold's section 1983 claims and the district court's accompanying award of attorneys' fees and costs under 42 U.S.C. § 1988 are set aside. On remand, the district court is directed to enter judgment in favor of the City on Gold's section 1983 claims. The district court's judgment in the amount of $26,500 in favor of Gold and against the City and any costs awarded Gold by reason of that judgment are not affected by this appeal because they remain supported by the jury's verdict on Gold's state law claim for false arrest. The district court's denial of the City's motion for judgment as a matter of law on Gold's section 1983 claims is REVERSED, the jury's verdict on Gold's section 1983 claims is SET ASIDE, and the district court's award of attorneys' fees and costs under section 1988 is VACATED.

---

record-keeping system for those documents.

[15]Because we find no evidence of a City policy of inadequate training and supervision, we need not address the City's contentions (1) that City policy was not the moving force behind any constitutional violations, and (2) that the handcuffing injury was *de minimus* and not cognizable.

15