**Michael PEREZ, Plaintiff,**

v.

**MIAMI–DADE COUNTY, Florida, Defendant.**

**No. 97–1915–CIV.**

United States District Court, S.D. Florida.

Dec. 14, 2004.

Peter William Bellas, Esq., Genovese Joblove & Battista, John Evron Kirkpatrick, Esq., John E. Kirkpatrick & Associates, Adam Brian Leichtling, Esq., Larson King, Miami, FL, Counsel for Plaintiff.

Eric Kirby Gressman, Esq., Lee Alan Kraftchick, Esq., Dade County Attorney's Office, Jason Edward Bloch, Esq., Dade County Attorney, Jackson Memorial Hospital, Miami, FL, Counsel for Defendant.

## SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment, filed July 30, 2004.[1]

### I. BACKGROUND

The Plaintiff Michael Perez and his partner Eric Mendez, while working as undercover detectives for the Miami–Dade Police Department on March 24, 1995, responded to their police radio broadcast stating that fellow police officers were in pursuit of several African–American males who had just robbed a Radio Shack. They sped to the scene of the robbery and joined in the chase of the suspects. When the suspects abandoned their vehicle, Plaintiff and his partner jumped out of the police car and continued the chase on foot.

While these events were transpiring, another Miami–Dade police officer, Sergeant William Alsbury, was approaching the area from a different direction and heard the same radio report broadcast over his police car radio. While speeding to the scene to lend assistance, Alsbury saw Plaintiff Perez and his partner running along the street

---

1. On November 10, 2004, Plaintiff filed a Response and a Statement of Undisputed Facts in support thereof, and on November 15, 2004, filed a Supplemental Statement of Facts. On November 18, Defendant moved for leave to exceed the page limitation on reply memorandums. This was granted on Court on November 22, 2004. Defendant's Reply was filed on December 9, 2004. On December 10, 2004, Plaintiff re-filed declarations and excerpts of testimony from complaints of excessive force in support of his Response.

away from the Radio Shack where the robbery had allegedly occurred. Seeing two men, dressed in civilian clothes, racing from the scene of an alleged robbery, Alsbury mistakenly assumed that undercover Officers Perez and Mendez were the two fleeing suspects. Sergeant Alsbury commenced to chase Perez and his partner in his police car.

Plaintiff contends that Alsbury "intentionally aimed his vehicle directly at the person he believed to be the subjects, gunned the engine, and struck [Plaintiff],"causing Plaintiff serious injuries, including herniated discs in his back and broken bones. (Comp. at 2:14.) Alsbury, on the other hand, testified that the entire incident was an accident. Alsbury stated that he drove past Plaintiff and his partner, made a U-turn into the yard where they were running, but the grass was wet, he lost control of the car and slid into Plaintiff. (Alsbury Dep. at 26.) After hitting Plaintiff and realizing that he was a fellow officer, Alsbury said: "I am sorry. I thought you were one of the subjects." (Alsbury Dep. at 27–28.)

Plaintiff, an Hispanic, contends that Alsbury intentionally hit him because Alsbury was a racist cop who mistakenly believed Plaintiff was an African–American. Plaintiff further contends that Alsbury's racist views were known to Defendant Miami–Dade County. Previously, Alsbury testified that he frequently used racially derogatory terms for African–Americans and considered himself a separationist, which, by Alsbury's definition, meant he had the right not to eat with, work with or live with African–Americans. (Trial Tr. at 97–104.) Alsbury frequently used the term "nigger" throughout his life, up until and including around the time of the incident in controversy. (Alsbury Dep. at 20–21.) Sometime in the 1980's Alsbury was determined to have violated County rules and regulations by using the term in the pres-

ence of an African–American female officer. (Alsbury Dep. at 19.) Specifically, when asking another police officer how he knew a sword was a Confederate sword, Alsbury inquired: "how can you tell that, does it have something like nigger blood on it or something." (Alsbury Dep. at 20.) Alsbury also testified that he had no problems with "Hispanics in any way, shape or form"; he was not a member of any separatist organization; and he did not share his views on separatism with other members of the Police Department. (Alsbury Dep. at 103–04.)

Plaintiff also contends that Defendant Miami–Dade County knew Alsbury had a history of condoning the use of excessive force against suspects and the County should have removed Alsbury from the force based on three considerations. First, Plaintiff alleges that Alsbury "was involved in numerous automobile collisions while on duty . . . . [and previously] struck a suspect with his police vehicle in order to apprehend him and was never punished for the incident." (Pl.'s Comp. at 3:22; Harms Report, Def. Exh.11.) Second, Alsbury allegedly bragged to another officer that he used his vehicle to apprehend suspects. (Def.Exh. 11.) Third, "Alsbury shot an African–American police officer and others with live ammunition during a training exercise." (Pl.'s Comp. at 3:21.)

The facts regarding the shooting accident are not in dispute. According to his testimony, Alsbury was selected to act as a sniper during a police training exercise, using a shot gun and blank ammunition. At least one of the rounds of ammunition contained live buck shot ammo, which, when Alsbury fired, injured at least fourteen police officers, including one African–American police officer and one of Alsbury's best friends on the force. (Alsbury Dep. at 74–86.) The County conducted an investigation, cleared Alsbury of any

wrongdoing and declined to punish him in any manner for the incident, despite the fact that the African–American police officer told investigators that she believed Alsbury was trying to kill her. (Pl.'s St. Facts at ¶ 33.)

Subsequent to the incident herein sued upon, Plaintiff contends that the County attempted to cover-up its wrongdoing by subjecting Plaintiff to retaliation and harassment. Plaintiff contends that the retaliation and harassment was representative of the County's systemic failure to appropriately discipline police officers who used excessive force and was part of a policy, known to the County's highest officials, of protecting offending officers by enforcing a code of silence.

Plaintiff testified at trial that when he reported the incident to Internal Affairs he was "greeted with: 'What he f* * * do you want.'" (Trial. Tr. at 361.) After filing this original complaint, Plaintiff testified that Defendant County tried to coerce him into dropping the lawsuit, threatened him with termination, and was told by Defendant's employee, Sergeant Honig, that his "f* * *ing career" was over and nobody wanted him at the police department. (Trial Tr. at 360–62; Pl's Comp. at 4:29–4:31.) Plaintiff testified that, to further harass him, Defendant hired private investigators who followed him, tapped his phone and listened in on his private conversations with a parabolic microphone. (Trail Tr. at 374; Pl.'s Comp. at 4:33–5:36.) The County has admitted that its agents surveilled Plaintiff, beginning on or about May 1, 1998. (Pl.'s Exh. GG.) Finally, Plaintiff contends that Defendant refused to allow him to consult with doctors of his own choosing and hired doctors to present false medical testimony at the previous damages trial in this case. (Pl.'s Comp. at 5:40–41.)

## II. PROCEDURAL HISTORY

This controversy has taken a long an arduous path before arriving at this point. Filed June 19, 1997, it has been tried to a jury and reviewed and remanded by the United States Court of Appeals for the Eleventh Circuit, in part, on two different occasions. As originally filed, the Complaint named two defendants, Defendant Miami–Dade County and Sergeant William Alsbury, and alleged six different claims, including three separately plead claims for deprivation of constitutional rights under 42 U.S.C. §§ 1983 and 1985, a violation of the Whistleblower's Act, assault and battery, negligence, and a claim under Florida's Entitlement to Full Pay Status law.

The genesis of the procedural posture of this case, the reason why the merits of Plaintiff's case took so long to be squarely before this Court, was the Defendants' inability to conduct proper discovery pursuant to the Federal Rules of Civil Procedure, the Local Rules of the Southern District of Florida and the Orders of this Court. Shortly after the filing of the Complaint, on September 12, 1997, the Court held a Rule 16 Scheduling Conference where the parties were given a chance to choose, with the Court's approval, a trial date and corresponding motion and discovery deadlines. At that Conference, the Court warned all parties that "the dates we pick today will be absolutely etched in concrete … so when it comes to pretrial, guys, get your discovery done and get it ready." (Sept. 12, 1997 Tr. at 10–11.) Unfortunately, however, counsel for Defendant County made it difficult for Plaintiff to prepare for trial by utterly failing to respond to requests for admissions, answer interrogatories, produce requested documents and produce witnesses for scheduled depositions.

On February 20, 1998, the Court held a final pretrial conference and, noting the

serious violation of the Court's orders on discovery deadlines, compliance with orders requiring discovery and the filing of a pre-trial stipulation, granted Plaintiff's motion for summary judgment on liability. The Court predicated its holding on its finding that Defendant, by repeatedly failing to respond to Plaintiff's requests for admissions, admitted the full contents of those requests. This included, for example, that there was a county practice, policy, or custom of allowing police officers to use unnecessary and unreasonable deadly force. In other words, summary judgment was granted because Defendant's admissions established all of the elements of Plaintiff's section 1983 claims.

Following entry of the Summary Judgment Order, the Court held a four day jury trial beginning on April 27, 1998, limited to determining the damages Plaintiff was entitled to for his section 1983 claims. After Plaintiff rested, Plaintiff dismissed Alsbury as a party defendant without prejudice. On May 1, 1998, the Jury received the case and, that same day, returned a verdict against the County, awarding Plaintiff $5.7 million dollars in compensatory damages. On May 27, 1998, after denying the County's motion for a new trial, the court entered judgment against Defendant for the $5.7 million jury verdict.

On July 9, 1998, the County filed its first appeal. Defendant's appeal was initially dismissed by the Eleventh Circuit, on March 1, 2004, for lack of jurisdiction. *Perez v. Miami Dade County*, No. 98–5075 (11th Cir.(Mar.1, 2001)). The Eleventh Circuit held that because this Court did not enter judgment on three of Plaintiff's counts, namely, Count IV (Violation of the Whistle–Blower Act), Count V (Deprivation of Constitutional Rights Under 42 U.S.C. § 1985), and Count VI (Entitlement to Full Pay Status), there was no final judgment in the case and the appeal was untimely.

Subsequently, cross-motions for summary judgment on Counts IV, V and VI were filed on May 14 and May 25, 2001. On August 22, 2001, the Court granted summary judgment for the County on all the remaining counts. Count IV (Violation of the Whistle–Blower Act) was dismissed for failure to exhaust administrative remedies; Count V (Deprivation of Constitutional Rights Under 42 U.S.C. § 1985) was dismissed as barred by the intracorporate conspiracy doctrine, and Count VI (Entitlement to Full Pay Status) was dismissed because Plaintiff did not comply with the procedural requirements of Florida law.

On September 14, 2001, the County and Plaintiff filed cross-notices of appeal with the Eleventh Circuit. The County appealed the Court's Order granting summary judgment as to liability on the section 1983 claim and Plaintiff appealed the Court's order granting summary judgment for Defendant as to Counts IV, V and VI. The County argued that the Court should not have granted summary judgment because the Court incorrectly deemed Plaintiff's requests for admission admitted. On July 17, 2002, the Eleventh Circuit held that Plaintiff's underlying requests for admission were improper and therefore vacated this Court's judgment and remanded the case for further proceedings. *See Perez v. Miami–Dade County*, 297 F.3d 1255 1268–70 (11th Cir.2002). The Eleventh Circuit affirmed the Court's order granting summary judgment for Defendant. *Id.*

On October 16, 2002, this Court received the Mandate of the Eleventh Circuit remanding the case for further proceedings. Since that time, the case has proceeded with discovery on liability issues that were previously incomplete because of the County's inability to timely respond to discovery requests. Also, importantly, the Court has permitted Plaintiff to amend the Complaint on three separate occasions. In

his current Complaint, Plaintiff alleges four counts of alleged deprivation of constitutional rights under 42 U.S.C. §§ 1983, 1985 & 1986.

On May 27, 2003, the Court set the case for jury trial for the two week period of March 15, 2004. This discovery phase of the case was delayed because of the contentious nature in which the attorneys conducted the process. Since the parties were unable to bring the case to trial within the Court's normal time frame, the Court agreed to extend its discovery and pleadings deadlines on two separate occasions. As ordered in the Court's Third Order setting trial and pretrial dates, the case was finally set for pretrial conference on October 1, 2004 and for jury trial during the two week calendar period of November 22, 2004.

On August 10, 2004, the Court denied the instant Motion for Summary Judgment, upon the basis that there appeared to be factual issues for submission to a jury. During the oral submissions by both parties during the pre-trial conference of October 1, 2004,[2] and after a fuller consideration of the plethora of legal issues, discovery material and the massive record, the Court determined that it had precipitously ruled on Defendant's motion and that it needed the benefit of fuller consideration of the parties' positions prior to formulating the issues in a pre-trial order. The Court therefore determined that it was proper to reconsider the Defendant County's previously filed motion for summary judgment and, on October 6, 2004, ordered Plaintiff Perez to file a response to Defendant's motion by November 10, 2004.

Prior to this, on September 10, 2004, Defendant County filed a Petition for Writ of Mandamus in the United States Court of Appeals for the Eleventh Circuit, directed to an order of this Court denying Defendant's motion to retry the issue of damages to a second jury empaneled to retry the liability issue. On October 22, 2004, the Court denied Plaintiff's motion to further extend time to respond to Defendant's summary judgment motion until the Eleventh Circuit resolved the mandamus proceeding. Although the Court was invited to participate in the mandamus proceedings by the Eleventh Circuit's October 15, 2004 Order, the Court did so only to the limited extent of expressing its opinion that the mandamus action was untimely and the issues raised therein should be resolved at a later time if, and when, it became necessary to do so.

### III. STANDARD OF REVIEW

Summary judgment is appropriate only where it is shown that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the record as a whole could not lead a rational fact-finder to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct.

---

**2.** The Court notes that pre-trial conference was more difficult than the average conference because the parties failed to file a proper pre-trial stipulation. Due to the lack of a stipulation that followed the Court's Order, the Court was forced to try and do much of

the work at pre-trial that the party's counsel should have already completed and included in the pre-trial stipulation. *See* Pre–Trial Order of March 17, 2004 and Rule 16.1E of the Local Rules of the Southern District of Florida.

2505, 91 L.Ed.2d 202 (1986). There is no requirement that the trial judge make findings of fact. *Id.* at 251, 106 S.Ct. 2505.

The party seeking summary judgment always bears the initial burden of pointing to that part of the record which shows the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir.1993). If the movant meets its burden, the burden then shifts to the non-moving party to establish that a genuine dispute of material fact exists. *Hairston,* 9 F.3d at 918. To meet this burden, the non-moving party must go beyond the pleadings and "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the non-moving party, then the court should refuse to grant summary judgment. *Hairston,* 9 F.3d at 919.

## IV. DISCUSSION

In Plaintiff's Third Amended Complaint, Plaintiff alleges four causes of action. Plaintiff alleges two section 1983 claims: a claim for excessive force and a claim for harassment. Plaintiff also has two claims for conspiracy under both section 1985 and section 1986. Defendant has moved for summary judgment on all four counts. The Court will analyze each in turn.

## A. Section 1983 Municipal Liability for the Use of Excessive Force

Count I of Plaintiff's Complaint alleges the use of excessive force against Plaintiff by Sergeant Alsbury and seeks to impose municipal liability on Miami–Dade County because the County allegedly had a policy or custom of permitting the use of excessive force against fleeing suspects. Defendant argues that summary judgment is appropriate on Count I because (1) it does

not have a policy permitting the use of vehicles to strike down fleeing suspects who pose no immediate danger to the officer or the public, and (2) it does not have a custom permitting the use of excessive force.

The fundamental principle in the law of municipal liability under § 1983 is that municipalities may be held liable only for their own conduct, not for the conduct of municipal employees. Title 42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

While the Supreme Court interpreted "persons" to include municipalities and thereby determined that § 1983 subjects municipalities to liability, it also limited the extent of municipal liability by prohibiting the incorporation of the doctrine of *respondeat superior. Monell v. New York City Dept. Of Social Servs.,* 436 U.S. 658, 689–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, a municipality may not be held liable solely because it employs a tortfeasor. *Id.* at 695, 98 S.Ct. 2018. Rather, a municipal "policy" or "custom" must have caused the plaintiff's injury. *See id.* at 694, 98 S.Ct. 2018; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the

municipality." *Bd. of County Comm'rs. of Bryan County v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Similarly, locating a " 'custom' that has not been formally approved by an appropriate decisonmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*

▮ Since a municipality will rarely have an express written or oral policy permitting the use of force, a Plaintiff can, in "limited circumstances," establish that a custom of excessive force exists by demonstrating that the municipality failed to adequately train and supervise its police officers. *City of Canton v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998). "The Supreme Court has instructed that these 'limited circumstances' occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *City of Miami,* 151 F.3d at 1350. Further, the plaintiff must prove that the municipality's failure to train evidenced a "deliberate indifference" to, or a "conscious choice" to ignore, the rights of person with whom the police come into contact. *City of Canton,* 489 U.S. at 388–89, 109 S.Ct. 1197. To establish "deliberate indifference or conscious choice" a plaintiff must show the municipality was on notice of a need to train and/or supervise in a particular area. *City of Miami,* 151 F.3d at 1350.

**1. Policy Permitting Excessive Force**

▮ Plaintiff argues that the County had an inadequate written policy at the time of the incident, which constituted a deliberate indifference to persons' rights because it permitted "racist officers such as Sergeant Alsbury to determine what '*he* reasonably believes necessary.' " (Pl.'s

Resp. at 22.) The Court notes it is unable to determine from Plaintiff's Response exactly what specific policy Plaintiff is referring to (i.e., a policy on the use of force or a policy on the use of motor vehicles?).

The Court finds, on the other hand, that the County had an official policy which prohibited intentionally striking a suspect with a car except in limited, lawful circumstances. Defendant submitted evidence that its Police Department Policy permits vehicle *pursuits* only when "officers have a reasonable belief that the fleeing suspect has committed or attempted to commit a felon which involves the use or threat of physical force to a person." (Def.'s St. Facts at 3:10; Gonzalez Aff. ¶ 17.) Further, the use of a police vehicle as a weapon is permissible only in a deadly force encounter; that is, when a suspect is likely to cause great bodily harm or death to the officer or someone else. (Def.'s St. Facts at 3:11; Gonzalez Aff. ¶ 17.) Even if the evidence established that Alsbury did intentionally strike Plaintiff, such act clearly was not pursuant to a municipal policy.

**2. Custom Permitting Excessive Force**

▮ Plaintiff argues that the County had a general custom of permitting the use of excessive force that arose because the County covers-up any incidences of excessive force and fails to adequately punish officers. Plaintiff relies in large part on its expert, retired Police Chief Harms, who opined that Defendant County inadequately trained and supervised its police officers and allowed a custom to arise whereby excessive force was used by Defendant's officers, all of which inexorably lead to Plaintiff's injury. (Def.Ex. 11.) In support of his opinion, Harms alleges the following: (1) over 250 people have been shot to death by Defendant's police officers since 1979; (2) Defendant has not termi-

nated any police officers for the use of excessive force since 1992; (3) Defendant's officers used force in excess of 5,400 times since January 1, 1990; (4) Defendant's mayor expressed "grave" concern over the use of force; (5) and on eleven occasions in which police officers are alleged to have used excessive force, covering a period of nearly fifteen years, the County either failed to discipline the officers or compensated the victims through settlements. (Def.Ex. 11.)

Plaintiff's allegations, even if accepted as true, are insufficient to establish that the county failed to adequately train and supervise its police officers in the use of a vehicle as a deadly weapon or permitted officers to use a vehicle as a deadly weapon by covering up unlawful incidences. First, as an initial matter, evidence of the past use of force by County officers is not evidence of a pattern of an unlawful use of force. It is not unlawful for police officers to use force, even deadly force; it is only unlawful to use excessive force. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (a police officer may use deadly force to apprehend a fleeing felon if the officer has probable cause to believe that the suspect poses a threat of serious bodily harm to the officer or to others). Plaintiff has presented no evidence that these incidents involved the use of excessive force. *See City of Miami*, 151 F.3d at 1351 (finding that evidence of failure to prosecute a substantial percentage of persons arrested for disorderly conduct did not constitute evidence of false arrests).

Second, the fact that Defendant might have settled some claims of excessive force over the course of many years is not sufficient to establish existence of a "custom" since a municipality obviously has a number of reasons to settle cases that are unrelated to any wrong-doing or violation of law by the municipality. Even frivolous claims may be settled as less costly than litigation and trial. *See Trevino v. Gates*, 99 F.3d 911, 918–21 (9th Cir.1996). To give any weight to settled cases when considering an issue of municipal knowledge or approval by a city of excessive force requires, at a minimum, analysis of the facts of the settled cases. While evidence of a systemic uses of excessive force by County officers might create an issue of fact, Plaintiff has simply failed to present any evidence that excessive force was used on a wide-scale throughout Defendant's police force. Plaintiff's attempt to rely on newspaper editorials and newspaper accounts of politicians' statements to demonstrate this type of widespread problem is ill-founded—that type of evidence merely represents opinion; it does not represent the type of admissible evidence that creates a genuine issue of material fact for the jury. Third, even if the Court could rely on the County's mayor's statements as quoted by the press, as an admission of fact to prove that there were widespread problems ignored by the County, Plaintiff does not accurately reflect the mayor's statements. The County's mayor, rather than expressing concern over the excessive use of force, expressed concern that the public had a *perception* that unnecessary excessive force was being used. (Def.'s Exh. 4 at 4; Def.'s Exh. 14.) While this may be the case, it does not prove that the County actually did permit the unnecessary use of excessive force.

More fundamentally, however, Plaintiff has simply failed to provide any evidence that Defendant should have been on notice that its officers were inadequately trained in the use of a vehicle as a weapon or were unlawfully using their vehicles as weapons. A court must look to the "particular area" of need to determine whether training was so obviously necessary that failure to provide training constituted deliberate indifference. *City of Miami*, 151 F.3d at 1351.

Thus, in *City of Miami*, the Court determined that a claim of inadequate training in the use of handcuffs failed because the Plaintiff "presented no evidence of a single prior incident in which a City police officer caused an injury by excessive force in handcuffing." *Id.* Similarly, here, Plaintiff has provided no evidence of any incident where Defendant's police officer unlawfully used a vehicle as a deadly weapon. On the other hand, Defendant has presented evidence that it has a training program that teaches its officers not to use their vehicles in a deadly manner except when necessary to protect their life or the lives of others. In such a case, the Court must find that the County did not inadequately train its officers in the use of vehicles as a deadly weapon or systematically cover-up the improper use of vehicles by its officers.

### 3. Deliberate Indifference to Alsbury's Racism and Recklessness

■ The Supreme Court has stated that in an extreme case a municipality could be held liable for the actions of its employees based on one single incident. *Bd. of County Comm'rs. of Bryan County*, 520 U.S. at 412–14, 117 S.Ct. 1382. For example, inadequate screening of a police officer's records can establish deliberate indifference. *See id.* However, "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequences of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* at 411, 117 S.Ct. 1382. The Supreme Court stressed that rigorous standards of inquiry must be applied in order to prevent the inadvertent incorporation of the doctrine of *respondeat superior* into section 1983 claims. *Id.* at 411, 117 S.Ct. 1382. Thus, culpability cannot depend on a mere probability; rather, it must depend on a finding that a particular injury of a specific nature was likely to occur to someone if no action was taken. *Id.* at 412, 117 S.Ct. 1382.

*Bd. of County Comm'rs. of Bryan County* is illustrative of the difficulty of proving deliberate indifference based on one single action and the rigorous standards applied. In that case, the Sheriff hired a deputy, the son of his nephew, with a record of arrests, including assault and battery and resisting arrest. *Id.* 400–01, 117 S.Ct. 1382. Perhaps due to his record, the Sheriff authorized the deputy to make arrests, but not to carry a weapon or to operate a patrol car. *Id.* Ultimately, the error of this poor hiring decision came to light after the deputy pulled over a woman for a speeding violation, dragged her out of her car by use of an "arm bar" technique and spun her to the ground, causing severe injury to her knees that required corrective surgery and possibly the need for knee replacements. *Id.* Despite what most would judge to be an eminently ill-sighted hiring decision, the Supreme Court held that because it was not so obvious that the deputy would injure the plaintiff in such a manner, Defendant could not be held liable.

Similarly, Plaintiff cannot establish that it was highly likely that Defendant's failure to terminate Alsbury would lead to Plaintiff's injury even if it is assumed Alsbury struck Plaintiff on purpose. First, Plaintiff's attempt to argue that Alsbury's actions were racially motivated does not further his burden of proof. Certainly Alsbury was a racist who disliked African–Americans. He admitted this. Also, Plaintiff has presented adequate evidence demonstrating that some fellow officers in the force knew that Plaintiff was a racist. However, the Court cannot assume that persons with policy-making authority in Defendant's Police Department knew he

was a racist; leap from the fact of racism to the conclusion that Alsbury intentionally hit African–American suspects with his car; or find that Defendant should have known Alsbury was likely to hit African–American suspects with his car. Simply put, while it might be unwise policy to permit racists to serve as County officers, Plaintiff has not presented evidence that a "plainly obvious consequence" of employing Alsbury would be the intentional unlawful use of force against African–Americans. If such a consequence were really so obvious, one would expect Plaintiff to have evidence of multiple racially motivated incidences of unlawful force over the course of Alsbury's twenty-five-plus year career.

Second, Alsbury's accidental shooting of fourteen police officers, including one African–American officer, during a training exercise does not lead to the conclusion that he would intentionally strike an African–American suspect with a car. The evidence shows that Alsbury accidentally shot a round of live ammo (instead of blanks) at his fellow officers during a police training exercise (from boxes of ammunition provided by the County). One of the victims, an African–American, thought that Alsbury was trying to kill her. Plaintiff relies on the fact that one of the officers harmed in the shooting was African–American to demonstrate Alsbury's prejudice. The record reflects that most of the officers harmed were white. In fact, one of the officers was Alsbury's best friend on the force. Evidence relied upon by Plaintiff elsewhere, tending to show that Alsbury was psychologically scarred by the incident, only reinforces the reasonable conclusion that the County ultimately reached after an investigation—the fourteen police officers *and* Alsbury were the victims of an unfortunate accident. Even if Alsbury did intentionally substitute live ammo for blanks into the shotgun, as Plaintiff implied suggests, there is nothing in the rec-

ord to suggest that the County knew or could have reasonably known that he would ever do anything like that.

Finally, Plaintiff's allegation that Alsbury hit another suspect with a car and condoned the use of force to apprehend suspects does not establish that Alsbury was likely to deliberately strike Plaintiff with his car. This allegation is vague and unsubstantiated. The only mention of these allegations that Plaintiff relies upon is found in the report of expert witness Harm's and the affidavits of two former police officers. Harm's report merely states the allegations as true without relating specifics, or providing his source of information. It is unknown what level of hearsay Harm's report represents, or even when the vehicular incident and comments alleged therein occurred. Vague hearsay allegations made by an expert are not admissible in evidence or sufficient to overcome the rigorous standard of review that a Court must apply in order to find liability based on a single action by a municipal employee. To find otherwise would improperly impose *respondeat superior* liability upon Defendant.

Plaintiff presents evidence through two former officers which is more specific than the Harm's report. First, Patrick McGeehan, a County police officer from 1987 to 2003 who served under Sergeant Alsbury in the 1980's, testified that "Alsbury instructed the people on his squad to do what was necessary to apprehend fleeing subjects and he would take care of the paperwork later." McGeehan declares that the striking of a subject with a car by an officer in the squad "was not beyond belief." Second, Larry Smothers, a County police officer from 1966 to 1994, declared that after arriving at the scene of an arrest of a burglary suspect in the spring or summer of 1968, he "heard Sergeant Bill Butler state that William Alsbury had

intentionally 'clipped' one of the fleeing suspects with his police vehicle in order to apprehend him." Further, "[a]t that time, William Alsbury also told . . . all of the other police officers that were present, and me that he 'clipped' the fleeing suspect with his police vehicle." Smother's declared that this suspect was not armed and Alsbury was never punished for hitting the fleeing suspect. (Pl.'s Exh. Z.)

McGeehan and Smothers' affidavits are compelling evidence that could be offered against Alsbury to prove that Alsbury intentionally struck Plaintiff. They obviously tend to support the allegation that Alsbury condoned and, on at least one previous occasion, used his police vehicle intentionally to apprehend a fleeing suspect. If Alsbury were still a defendant and part of this case, an issue of fact for the jury would exist as to Alsbury's liability. However, McGeehan and Smothers' affidavits (considered on summary judgment) or testimony (at trial) are not sufficient evidence to create an issue of fact that the County was deliberately indifferent to Alsbury's likely use of unnecessary unlawful force. Notably lacking in the affidavits are any allegations that these two officers shared their knowledge with anyone with policy-making authority in the County or Police Department.

Further, Plaintiff does not provide any evidence that allegations of unlawful force were made to the Police Department against Alsbury. There is in fact no evidence that a complaint was ever made in regard to any incident against Alsbury that would have necessitated an investigation. Thus, McGheehan and Somthers provide no basis for determining that the County knew or should have known that Alsbury would intentionally try to strike fleeing suspects because of a prejudice against African–Americans.

## B. Section 1983 Municipal Liability for Harassment

Count II of Plaintiff's Complaint alleges that Defendant "violated [Plaintiff's] Constitutional and Civil Rights including, but not limited to, his rights to free speech, access to the courts, and privacy . . . . by, *inter alia,* retaliating against him, harassing him, and surveilling [sic] him." (Pl.'s Comp. at 11:74–76.) Plaintiff alleges that this injury consisted of the County hiring a private investigator to follow him and spy on his conversation with a parabolic microphone, harassment at work by fellow police officers angry over his lawsuit, the County's refusal to permit him to consult with medical doctors of his choice after his injury, retaliation against Plaintiff's witnesses, the offering of false medical testimony at trial by the County's doctors, and the denial of disability benefits because Plaintiff initiated this lawsuit. Plaintiff alleges that "Miami–Dade County has a custom, practice, or policy of retaliating against and harassing persons who sue the County or who exercise First Amendment protected speech. . . . and the Board of County Commissioners have not ordered the County to cease its practice of retaliating against and harassing [Plaintiff.]" (Pl.'s Comp. at 4:28–8:60.)

█ In order to establish a section 1983 First Amendment retaliation claim, a plaintiff must prove that a custom or policy of retaliation exists. It is not enough for a plaintiff to simply show that an administrator retaliated against him; the plaintiff must demonstrate that a person with final decision-making authority for the municipality authorized retaliation. *Scala v. City of Winter Park,* 116 F.3d 1396 (11th Cir. 1997).

█ Here, Defendant has presented evidence that the County prohibits retaliation against employees for exercising their First Amendment Rights. It is Defen-

dant's official policy only to permit discipline for just cause, (Def.Exh. 5), forbid any infringement of employee's free speech, (Def.Exh. 6), forbid retaliation against those who report misconduct by fellow employees, prohibit retaliation against those who file complaints and permit employees the right to file complaints and obtain relief if they suffer any adverse employment action for filing a complaint (Def.Exh. 8.) To show that, in spite of its official policy against retaliation, there exists an "unofficial policy" wherein the Defendant County permits such retaliation when, as here, an officer sues the County; Plaintiff relies on a recital of those events he personally experience (i.e., spying, caustic remarks by his co-workers, etc.). These instances, accepted as true for summary judgment analysis, do not rise to the level of establishing the unofficial policy condoning harassment Plaintiff suggests. Official retaliation creating municipal liability under section 1983 requires much more than has been demonstrated by Plaintiff's proof in this record.

Plaintiff also suggests that the County implicitly admits it had a policy of retaliation because his disability benefits were denied pursuant to a County ordinance that conditions receipt of the benefits on an employee's agreement to forgo litigation. *See* Miami–Dade County Code Ch. 2–56. It is not retaliation for an employer to provide greater workers compensation benefits to employees who temporarily refrain from suing them than to those who choose to sue immediately. Such a policy benefits both employee and employer because it reduces the cost of workers compensation and thereby increases the benefits an employer can provide.

## C. Section 1985 and 1986 Conspiracy Claims

■■■ Counts III and IV of Plaintiff's Complaint allege claims of conspiracy to harm Plaintiff by depriving him of his rights to free speech, access to the courts, and privacy under section 1985 and 1986, respectively. The harm Plaintiff alleges in each Count are substantially the same as the retaliation claims made in Count II, pursuant to section 1983. However, in Counts III and IV, Plaintiff alleges that there was a conspiracy among County employees and County paid doctors and investigators to undermine his claims and cover-up the investigation of his injuries.

Plaintiff's conspiracy claims are barred by the mandate rule and law of the case doctrine. This Court previously granted summary judgment dismissing conspiracy claims included in the original complaint, based on the intra-corporate conspiracy doctrine. *See* Order of August 22, 2001 Granting Summary Judgment for the Defendant. Plaintiff appealed from that order, and the Eleventh Circuit affirmed, holding that Plaintiff's contention that this Court erred "in applying the intracorporate conspiracy doctrine" was "without merit." *Perez,* 297 F.3d at 1263 & n. 20. The Eleventh Circuit's ruling on that issue precludes any further litigation because, despite the Court's willingness to permit Plaintiff to proceed with a new claim, no new evidence was offered to substantially alter the nature of the claim. Without any new evidence, the issue remains the same as before and the well-settled mandate rule requires that any issue already decided by an appellate court be followed in all subsequent proceedings. *Toole v. Baxter Healthcare Corp.,* 235 F.3d 1307, 1313 (11th Cir.2000). Plaintiff argues that new evidence was offered because he now alleges that Doctors not on the County pay roll, but acting as agents, were part of the conspiracy. However, this evidence is not truly "new," in the sense that it was previously unavailable or undiscoverable. *See Schering Corp. v. Illinois Antibiotics Co.,* 89 F.3d 357, 358–359 (7th Cir.1996).

## V. CONCLUSION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, its is

ORDERED and ADJUDGED that Defendants' Motion for Summary Judgment be, and the same is hereby, GRANTED. Plaintiffs' Complaint is hereby DISMISSED in its entirety.